2013 VT 45

## State of Vermont v. Frank Fellows

[76 A.3d 608]

No. 11-386

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed June 28, 2013

78

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Joshua S. O'Hara*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant Frank Fellows appeals his conviction for sexual assault and lewd and lascivious conduct with a child — his daughter, S.M. First, he argues that the trial court erred by allowing the State to question his sisters about his relationship with S.M.'s mother when the mother was a minor and to use the evidence of that relationship in its closing argument to show that he acted in conformity with that prior bad act. Second, he contends that the trial court committed reversible error when it admitted testimony from S.M.'s friend relating a conversation that she had with S.M. on the day after the incident. We affirm.

¶ 2. The following facts were presented at trial. S.M., the putative victim, is defendant's fourteen-year-old daughter. S.M.'s mother was fourteen years old, and defendant was twenty years old, when S.M. was conceived. Defendant and the mother never married, and did not live together at the time of the incident out of which the charges arose. At that time, S.M. was spending half of her time with each parent, alternating weeks with each.

¶ 3. On the evening of April 17, 2009, S.M. spent the night with her father in a camper on some land that he had owned. The two did some work moving brush and moving rock, made a fire, had dinner, and went to bed around 10 p.m. They slept on the same bed, as the other beds in the camper had objects on them. Each slept in a sleeping bag.

¶ 4. S.M. testified that she awoke sometime in the middle of the night to find her sleeping bag unzipped and defendant's hand inside her shirt, on her stomach. She was afraid, and pretended to be asleep. She moved her arm over her breasts to protect herself, but he pushed his hand under her arm to her breasts and rubbed them. He then started to move his hand down her stomach toward her pants, at which point she tried to roll away. He used his arm and leg to pull her onto her back. This happened two or three times, and then he put his hand inside her pants outside her underwear and started touching her vaginal area. Then he put his hand inside her underwear and continued to touch her in the same area. She tried to roll away again, and he put his hand down the back of her pants inside her underwear and inserted his finger into her vagina from the back. She felt a burning sensation and pain. He removed his hand from her pants and then massaged her breasts again. He then put his hand on her left breast and left it there until the alarm went off in the morning, at which point he removed it. She let him believe that he was

waking her up, and he told her that she had started to fall off the bed in her sleep a few times and that he had to keep pulling her back onto the bed. She pretended she had no idea what he was talking about. She did not get dressed, but grabbed her clothes, and he drove her to her mother's house.

¶ 5. S.M. did not tell her mother what had happened. Her mother asked her if something was wrong, and she responded that she was tired. She did, however, send a text message while at her mother's house to her best friend, K.D. Her mother drove her to the hospital to take a babysitting course. While S.M. was at the course, K.D. responded to her text message. S.M. wrote to K.D. that something really bad had happened, but that she was not able to talk right then. At the lunch break, she sent K.D. a text message explaining that she had woken up to her father molesting her. She told K.D. that she needed help to get away from him, so they made a plan for S.M. to spend the night at K.D.'s house.

¶ 6. After the babysitting course, defendant picked up S.M. from the hospital, as planned, and took her to a dinner at the house of his sister and brother-in-law. She asked him if she could spend the night at K.D.'s house, and he agreed. S.M. testified to feeling "a little bit . . . suicidal[ ]" during her time at her relatives' house.

¶ 7. After the dinner, defendant took S.M. to K.D.'s house. As soon as she entered the house, S.M. began to cry. While S.M. was at K.D.'s house, she received a text message from her older sister, S.F., saying that she was in town, and S.M. responded, telling her not to go to defendant's house. S.F. called but S.M. was too upset to speak to her, so she handed the phone to K.D. and K.D. related to S.F. what had happened. S.F. then came to K.D.'s house. S.F. called S.M.'s mother and informed her of the situation. S.M.'s mother then came to K.D.'s house to speak to her daughter. She then called the police, and took S.M. to the hospital, where S.M. was too upset to speak to the staff but provided a written statement. Because no one at the hospital was qualified to perform a sexual assault examination on a minor, S.M.'s mother took S.M. to Dartmouth Hitchcock Medical Center the next day. On the Monday following the incident, S.M. went to the Department for Children and Families for an investigation.

¶ 8. Defendant was charged with sexual assault and lewd and lascivious conduct. Defendant denied the charges, and the case went to trial by jury. In addition to S.M., the witnesses for the

State at trial were a clinical psychologist who testified as an expert witness, K.D., the nurse practitioner who examined S.M. at Dartmouth, S.M.'s counselor, S.M.'s teacher, S.F., and the trooper who conducted the initial interview with defendant. Through the trooper, an audio recording of defendant's interview with him soon after the incident was introduced and played for the jury. In that interview, defendant expressed confusion and frustration, stating that S.M. would not lie, but that he did not remember having touched her. He raised the possibility that he might have done so in his sleep. At one point in the interview, defendant stated, "I never knew if she woke up." The witnesses for the defense were defendant's two sisters. Some details of the trial are provided in the discussion below as needed.

¶ 9. The jury convicted defendant; he was sentenced to five years to life imprisonment for the sexual assault conviction and five to fifteen years for the lewd and lascivious conduct conviction, the sentences to be served concurrently. This appeal followed.

¶ 10. Defendant's first argument on appeal is that the trial court erred by allowing the State to question his sisters about his sexual relationship with S.M.'s mother when she was a minor and to use the evidence of that relationship in its closing argument to show that he acted in conformity with that prior bad act.

¶ 11. Vermont Rule of Evidence 404(a) does not allow evidence of a person's character to show that the person acted "in conformity therewith on a particular occasion." There is an exception, however, for evidence of a pertinent trait of character of an accused. *Id.* 404(a)(1). A defendant wishing to offer such evidence may do so only through testimony "as to reputation," and not through personal opinion or evidence of specific past incidents. *Id.* 405(a). Once the issue of a defendant's character has been raised, the prosecution may "rebut the same" with additional character evidence. *Id.* 404(a)(1). "On cross-examination [of defense witnesses], inquiry is allowable into relevant specific instances of conduct." *Id.* 405(a); see Reporter's Notes, V.R.E. 405 (Vermont rule does not allow proof of character by opinion evidence, contrary to federal rule). The cross-examination "is solely to allow impeachment of the character witness." *State v. McCarthy*, 156 Vt. 148, 152, 589 A.2d 869, 872 (1991).

¶ 12. The defense began its case by admitting that defendant impregnated S.M.'s mother when she was fourteen years old.

Defense counsel said that defendant had made a "very huge mistake" in doing so, but that he had turned his life around and made up for his mistake by raising the daughter who was a product of his relationship.

¶ 13. During the defense case, both of defendant's sisters testified with respect to defendant's interest in young girls. Defense counsel phrased his question in terms of defendant's reputation for the "last six or seven" or "last seven or eight" years. The first sister said that "I never heard anything about that" and went on to describe her own observation that defendant had no such interest. The second sister responded to the question whether defendant had a reputation in the community within the last seven or eight years "with regard to his sexual interest in teenage girls." She answered, "He doesn't have any," and emphasized that people send their children to defendant's house to be with him and his daughter.

¶ 14. On cross-examination, the State confronted each sister with the fact that defendant had impregnated S.M.'s mother when she was fourteen years old. The prosecutor reiterated the statement of defense counsel about defendant's conduct and its effect. The first sister admitted that because defendant impregnated S.M.'s mother he did have a sexual interest in teenage girls. The second sister admitted that defendant did have a sexual interest in teenage girls when he impregnated S.M.'s mother, but testified that this interest disappeared over time. The prosecutor continued to cross-examine on when the sexual interest abated and how the sister could prove it. Defense counsel objected to the questioning of the first sister on the grounds that the question about reputation put to the witness had been about only the "last seven or eight years," and that the State was questioning about events from before that time period, and the court responded, "I think the point has been made." Defense counsel made no objection to the questioning of the second sister.

¶ 15. The State returned to this topic during its closing. The prosecutor stated, "There's no proof that he's had relations with another fourteen-year-old girl until this case. This is the second time. It happened once fourteen years ago and now the girl who was the product of that sexual encounter is here to testify herself that she too was the subject of sexual conduct . . . ." In rebuttal, the state's attorney said again, "[H]e did it once before and he did it again." Again, defendant did not object to the State's closing

arguments. The trial court gave no instructions to the jury as to how they could use the information relating to defendant's relationship with S.M.'s mother.

¶ 16. Because defense counsel did not object to the questioning for the reasons that defendant now raises on appeal, but objected solely on the ground that the cross-examination exceeded the scope of the direct examination, the objection to the prosecutor's cross-examination was not preserved. See *State v. Lettieri*, 149 Vt. 340, 344, 543 A.2d 683, 685 (1988). Nor did defense counsel object to the use of the evidence in the State's closing argument. Therefore, we review only for plain error. See *State v. Simmons*, 2011 VT 69, ¶ 12, 190 Vt. 141, 27 A.3d 1065.

¶ 17. To begin with the cross-examination, we find no plain error because we find no error at all. In reaching this conclusion, we recognize that the defense evidence complied with V.R.E. 405(a) minimally, if at all. According to that rule, defendant could address his character only through evidence of reputation. The first sister testified that she was unaware of defendant's reputation with respect to sexual interest in teenagers but went on to give her opinion that defendant had no such sexual interest. The second sister testified that defendant had no reputation with respect to sexual interest in teenagers but also went on to give her opinion on the subject. The prosecutor responded with one instance of specific conduct that was relevant to the testimony that the sisters gave, as authorized by Rule 405(a). We recognize that if the sisters' evidence had fully complied with the rule by addressing only defendant's reputation, the State's cross-examination would be similarly limited. Nevertheless, the prosecutor would be entitled to explore the idea that defendant's impregnation of S.M.'s mother was inconsistent with the reputation that was being asserted to undercut the reliability of the reputation testimony.

¶ 18. Defendant argues that this case is controlled by *State v. McCarthy*, 156 Vt. 148, 589 A.2d 869 (1991), a child sexual assault case decided on plain error because the cross-examination of the defendant's character witnesses exceeded the boundaries of V.R.E. 405(b). *McCarthy* has superficial similarities to this case because defendant was charged with assaulting his daughter, but the cross-examination of the character witnesses in that case related to an alleged sexual assault on another family member. The other

family member in *McCarthy* was the defendant's son, and the prosecutor used cross-examination of the character witnesses to prove that the defendant had also sexually assaulted that son. Rather than asking how the report of that act affected the witnesses' opinion of the defendant's character, the prosecutor "attempt[ed] to show that [the] defendant engaged in sexual misconduct in the past with his children, that the family failed to properly protect the children and that the jury should consider this in deciding" the defendant's guilt. *Id.* at 154, 589 A.2d at 873. We found that "[t]his use was clearly intended to demonstrate a character trait related to sexual misconduct or abuse of [the] defendant's children to prove [the] defendant acted in conformity with that character trait in this case — a use expressly prohibited by V.R.E. 404(a)." *Id.*

¶ 19. Here, in the cross-examinations of the sisters, there was no parallel to the cross-examination to prove a different sexual assault as the prosecutor did in *McCarthy*. In this case, the prosecutor cross-examined with respect to a specific instance of conduct that defendant admitted and specifically acknowledged in his opening statement to the jury. The cross-examination here was a direct challenge to the credibility of the character evidence. Our holding in *McCarthy* does not apply to this case.

 ¶ 20. We recognize that the closing argument went beyond impeachment of the character witnesses and suggested that because defendant had sexual relations with S.M.'s mother when she was fourteen years old the jury could infer that he had sexual relations with S.M. Nevertheless, defendant invited this analysis because he labeled sexual interest in teenage girls as a character trait, hoping to persuade the jury that if he had no such character trait he must not have sexually assaulted S.M. Moreover, defense counsel acknowledged defendant's sexual relations with S.M.'s mother when she was underage in his opening statement to the jury, hoping to minimize its impact. It could not be lost on the jury that he was charged with sexual assault on the daughter when she was exactly the same age as the mother at the time that defendant had sexual relations with her. If he wanted to prevent the jury from drawing an improper inference, he should have sought a limiting instruction from the court. "Comments made during a closing argument will not amount to plain error unless they are so manifestly and egregiously improper that there is no room to doubt the prejudicial effect." *State v. Martel*, 164 Vt.

501, 506, 670 A.2d 845, 849 (1995). We find no plain error in the prosecutor's closing argument.

¶ 21. Second, defendant contends that the trial court committed reversible error when it admitted testimony from K.D. relating the conversations that she had with S.M. on the day after the incident.[*] The court allowed the testimony, saying it was admissible under either the "fresh complaint" or the "excited utterance" exception to the hearsay rule. Defense counsel properly objected, so the argument was preserved.

¶ 22. Defendant and the State make a number of arguments as to whether the "fresh complaint" hearsay exception exists in Vermont, and whether an "excited utterance" can take place so long after the event provoking the excitement under this Court's precedent in *State v. Lemay*, 2006 VT 76, 180 Vt. 133, 908 A.2d 430. We need not enter that fray, however, as any error was harmless beyond a reasonable doubt.

¶ 23. "When conducting a harmless-error analysis to determine whether the jury would have convicted without the offending evidence, we consider the extent to which the offending evidence was inculpatory, whether it was cumulative or duplicative of other evidence, and how prominent it was at trial." *State v. Mumley*, 2009 VT 48, ¶ 20, 186 Vt. 52, 978 A.2d 6.

¶ 24. Certainly, there is no dispute that the evidence offered by K.D. as to her conversation with S.M. was inculpatory. However, none of the other prongs of this test weigh in favor of finding prejudice. The only possible useful information gained from K.D.'s testimony was (1) the details of the incident, and (2) the fact that S.M. told K.D. about the incident the day after it occurred. However, S.M. herself testified in much greater detail about the incident during trial, and the nurse practitioner at Dartmouth who

___

[*] It is not entirely clear if defendant is objecting on appeal to K.D.'s testimony as to the content of the text messages she received from S.M. as well as to the conversations that S.M. had with K.D. at K.D.'s house. His brief suggests that he is, referring to "two conversations," but the argument is about only the error of admitting the testimony under the "fresh complaint" or "excited utterance" exception. Although it is not entirely clear, the testimony as to the text messages appear to have been admitted not under that exception but instead as nonhearsay — not offered for the truth of the matter asserted, but instead as background to explain why S.M. came to K.D.'s house. Thus, the appeal seems to be best described as about the conversation at K.D.'s house. Either way, our analysis of why the conversation at K.D.'s house was harmless applies just as strongly to the content of the text messages.

86

examined her the next day also testified as to what S.M. told her, so the details offered by K.D. were duplicative. As for the fact that S.M. reported the incident to K.D. the day after it occurred, even absent K.D.'s testimony, there would be no question of this. Not only did S.M. testify to informing K.D on the day in question, but the nurse who examined S.M. at Dartmouth the next day testified, without objection, that she had received a call the night before — the same day as S.M.'s conversation with K.D. — about the incident so that she could prepare to examine S.M. the next day.

¶ 25. Nor was K.D.'s testimony prominent at trial. In its opening argument, the State mentioned K.D. to narrate the story of the incident, without mentioning specifically any testimony that would come from her about it, referring to her testimony only by saying that "[S.M.], [K.D.], and [S.F.] will say that the greatest embarrassment she ever suffered in her life was people finding out what had happened to her." Similarly, in its closing statement, the State referred extremely briefly to K.D.'s testimony, referring to none of the details of the testimony and reminding the jury only that K.D. had testified that S.M. had texted her during the day after the incident, and that K.D. urged disclosure to S.M.'s mother. Cf. *id.* (finding prominence in part because "the State referred to defendant's [erroneously admitted] statements in its opening and closing statements").

¶ 26. Because K.D.'s testimony was duplicative of other testimony and not prominent in the State's case, if its admission was error at all, it was harmless error beyond a reasonable doubt.

*Affirmed.*