2014 VT 68

## State of Vermont v. Tiffanie Felix

[103 A.3d 927]

No. 12-248

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Crawford, Supr. J., Specially Assigned

Opinion Filed August 1, 2014

*William H. Sorrell*, Attorney General, and *Evan Meenan*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Rebecca Turner*, Appellate Defender, *Anna Saxman*, Deputy Defender General, and *Pamela Eaton*, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

¶ 1. **Robinson, J.** Defendant Tiffanie Felix appeals her conviction for the sale or delivery of 200 milligrams or more of heroin following a jury trial in the Rutland Superior Court, Criminal Division. Defendant argues that the court erred in refusing to allow her to impeach the credibility of the State's key witness in various ways, depriving defendant of a fair trial. We reverse and remand for a new trial.

I.

¶ 2. Two sets of events are relevant to this appeal. First, in July 2010, the State's key witness, who was facing charges for aiding in the commission of a felony and aiding in the concealment of stolen property, entered into a cooperation agreement with the Vermont Drug Task Force (VDTF) to work as a confidential informant. The terms of the confidential-informant agreement provided that the informant's cooperation with VDTF was to be made known to the prosecutor handling her underlying charges, who would consider her cooperation in recommending a sentence to the court. In the agreement, the informant agreed to cooperate with the investigation of three targets, conduct controlled buys, wear audio-surveillance devices, and testify truthfully at any hearing or trial regarding any case in which she cooperated. The informant's principal contact at VDTF was Detective David LaChance.

¶ 3. On July 27, 2010, Detective LaChance gave the informant $150 to purchase heroin in a controlled buy at defendant's apartment. Before the informant entered defendant's apartment,

Detective LaChance did a pat-down search to ensure she was not carrying any drugs with her into the apartment. He did not perform a cavity search. The informant was not wearing a recording device during the controlled buy.

¶ 4. Detective LaChance or another officer with whom he was in radio contact observed the informant from the time she left Detective LaChance's car until she entered the apartment, and again after she exited and returned to Detective LaChance. The informant was the only witness to testify about what happened in defendant's apartment. She testified that she entered defendant's apartment and purchased $150 worth of heroin from defendant. She testified that she subsequently went upstairs to the bathroom, but that she did not get any heroin there, or use or tamper with the heroin she had just purchased from defendant. The informant testified that when she came downstairs from the bathroom, she saw that a man she did not know had entered the apartment. She testified that she did not get any drugs from him. An officer who was watching the apartment confirmed in his own testimony that an unidentified man entered the apartment while the informant was there. Detective LaChance testified that the informant returned from the controlled buy with ten bags of heroin. Upon her return, he performed another pat-down search of the informant's clothing and confirmed that she had no other heroin or money on her person. He also testified that, based on his training and experience, the bags of heroin the informant provided after the buy did not appear to have been stored in a body cavity. This evidence was the basis for defendant's conviction.

¶ 5. ■ The second set of alleged events that is central to the issues on appeal of defendant's conviction involves a traffic stop of the informant's vehicle a month later, and the impact of the events at that traffic stop on Detective LaChance's cooperating-informant agreement with her. Detective LaChance's "Statement of Termination" of the informant's cooperation agreement includes the following account:[1]

---

[1] The State filed a motion to strike portions of defendant's printed case, including depositions of Detective LaChance and the informant, and Detective LaChance's statement of termination of the cooperation agreement. The State argues that these documents were not submitted below and are not a part of the record on appeal. On appeal, our review is "confined to the record and evidence adduced at trial." *Hoover v. Hoover*, 171 Vt. 256, 258, 764 A.2d 1192, 1193 (2000). The record

On 8-20-10 Trooper Duca stopped [the informant] who was found to have another known drug offender inside her vehicle. When stopped [the informant] told Tpr Duca that she was working for me, at that time in the middle of a deal . . . . [I]n fact I did not know that [the informant] was with the offender.

As a result of this stop Tpr Duca recovered 34 bags of heroin from the passenger/offender . . . .

As of that stop I have not had any contact with [the informant].

Due to the above information [the informant] is terminated and AG Robert Menzel was notified as was Tpr McNeil. [The informant] was re-cited for the charges of assc to burglary.

Evidence proffered in connection with pretrial motions suggests that Detective LaChance expressly acknowledged that he terminated the informant's cooperation agreement "for untruthfulness." After termination of her cooperation agreement with VDTF, the informant pled to the underlying charge against her, securing a deferred-sentence agreement that required her to cooperate in testifying at defendant's trial.

## II.

¶ 6. At the heart of this appeal is the defendant's desire for the jury to know that prior to trial the State's lead investigator stopped working with the State's own star witness (the informant) — on whose credibility the State's case was entirely dependent —

is not, however, limited to matters actually admitted into evidence and can include documents considered by the court, including, for instance, documents a trial court considers as a proffered exhibit but ultimately refuses to admit into evidence. See *United States v. Burke*, 781 F.2d 1234, 1245-46 (7th Cir. 1985); 16A C. Wright et al., Federal Practice and Procedure § 3956.1, at 631 (4th ed. 2008). In this case, defendant specifically tried to introduce Detective LaChance's termination statement. The trial court ruled the statement inadmissible. It was not improper to include the proffered and rejected exhibit in the printed case for the limited purpose of enabling us to review the court's evidentiary ruling. Likewise, the State submitted the two depositions it now seeks to strike in connection with its pretrial motion in limine to exclude certain evidence concerning the informant's termination. Although their relevance is limited to the evidentiary issue before us, rather than, for example, the sufficiency of the evidence introduced at trial, we decline to strike them from the printed case.

because, as a result of the traffic stop incident, he lost confidence in her truthfulness. The State tried at every juncture to make sure that the jury would not be privy to this information. This conflict played itself out through pretrial motions, evidentiary rulings at trial, and post-trial motions.

¶ 7. Before trial, the State filed a motion in limine with respect to information concerning VDTF's termination of its cooperation agreement with the informant. The State argued that defendant could ask when and why the informant was terminated only during cross-examination of her, and for the sole purpose of inquiring into her character for truthfulness, but could not introduce extrinsic evidence concerning her termination or inquire into it "for any other purpose or in any other manner." Defendant could not, the State argued, introduce extrinsic evidence concerning the informant's termination due to the limitations in V.R.E. 608(b). The State further argued that the informant's termination was not relevant to her motive for testifying against defendant and thus the defense could not base an inquiry on V.R.E. 404(b).

¶ 8. Defendant, on the other hand, filed a pretrial notice of intent to offer evidence that the informant was stopped in August 2010 and lied to the trooper by telling him she was in the middle of a controlled buy for VDTF at the time of the traffic stop. Defendant sought to introduce this information to show that the informant's cooperation agreement was terminated as a result of this incident. Defendant's notice cited V.R.E. 404(b), 608 and 609. In arguing against the State's motion, defendant indicated that she sought to introduce evidence that the lead investigating officer in the case terminated the informant for untruthfulness stemming from the traffic stop incident. Defendant argued that the evidence showed "the context of her relationship with the drug task force and police officers." The VDTF's agreement with the informant was not, in fact, the agreement pursuant to which the informant was testifying; the informant's cooperation agreement had been terminated, and she was now testifying pursuant to the requirements of her deferred sentence in the underlying charge. Defendant argued that the jury was entitled to understand that.

¶ 9. After a hearing, the court ruled that defendant could ask the informant about the traffic stop incident on cross-examination, but deferred ruling on the other questions raised by the parties' pleadings until the evidence was further developed at trial, assuming a timely objection.

¶ 10. At trial, defendant made numerous attempts to elicit information about the termination of the informant's cooperation agreement. During cross-examination of Detective LaChance, defendant offered the informant's "packet," containing her cooperation agreement, Detective LaChance's termination statement, and various other documents, as evidence. The court declined to admit the termination statement on the ground that it contained hearsay in the form of the police officer's statements regarding the traffic stop. Later in the cross-examination, the court reminded defendant to limit her questioning about Detective LaChance's reasons for terminating the informant's cooperation agreement. The court explained that she could ask the detective if the informant had been terminated, but if the reason was based on hearsay, defendant could not ask about the reason.

¶ 11. Defendant was able to confirm, through Detective LaChance's testimony, that the informant's cooperation agreement had been terminated. Detective LaChance testified that he had attempted to contact the informant to notify her that she had been terminated but that he was unable to reach her. He further confirmed that he advised the prosecutor in the informant's case that her cooperation agreement had been terminated. After defendant twice attempted to ask Detective LaChance if the informant was terminated "due to an incident," both of which were interrupted by the State's objection, the following sidebar occurred:

Court: Where are we going with this questioning?

Defense Counsel: So I was going to him terminating her, and then my next question was, "You thought she couldn't cooperate in this investigation honestly"—

Court: You thought she what?

Defense Counsel: "You thought she couldn't cooperate in this investigation honestly and truthfully?" The following question, "Was she ultimately terminated?" That I'm not going to say but—

Court: Again, it's based on hearsay, so I'm not going to allow that. I'm going to tell you not to talk about the termination. Further, it's been brought up like three times.

¶ 12. Defendant never asked Detective LaChance about whether he believed the informant could continue to cooperate honestly and truthfully with VDTF and engaged in no further questioning with him about the reasons for her termination.

¶ 13. At the end of Detective LaChance's cross-examination, defendant stated for the record that she objected to the court's limitations on her questioning regarding the termination of the informant's cooperation agreement. She argued that the issue of the informant's termination went to the informant's "relationship with the officers" and the fact that she was no longer bound by her agreement with VDTF. The court again stated that the information defendant sought was hearsay. It further explained that the information was "impeaching by extrinsic evidence and it ha[d] to come in through the [the informant]."

¶ 14. On cross-examination of the informant herself, defendant engaged in a lengthy line of questioning regarding her statements to the police officer during the traffic stop. Defendant asked: "On [the date of the traffic stop], isn't it true that you lied to the police by telling them that you were working with the Task Force in the middle of a controlled buy?" The informant responded in the negative. Defendant asked the witness four times during the ensuing line of questioning whether she told the police officer she was with her passenger because she thought he was in possession of drugs, suggesting that she was working for VDTF at the time. Each time, the informant testified that she could not recall exactly what she told the police officer but that there must have been some misunderstanding if he took her statement to mean she claimed to be in the middle of a controlled buy for VDTF. The court eventually directed defendant to move on from this question.

¶ 15. With respect to the termination of her cooperation agreement, the informant testified that she stopped working for the VDTF because she "felt uncomfortable," that she never contacted Detective LaChance to let him know that she would no longer cooperate, and that he did try to call her a few times but she did not answer his calls because she was "busy at the time."

¶ 16. At the close of the State's case, defendant moved for a judgment of acquittal based on her earlier objection to the court's exclusion of testimony regarding the informant's termination as it relates to her truthfulness. The court denied defendant's motion for judgment of acquittal and reiterated that defendant had been permitted to question the informant about the reasons for her

termination, and that questioning Detective LaChance about the reasons for the termination would have called for inadmissible extrinsic evidence under V.R.E. 608 and inadmissible hearsay because Detective LaChance had no firsthand knowledge of the August 2010 traffic stop.

¶ 17. After trial, defendant filed a motion for a new trial, arguing that the court improperly limited the cross-examination of both the informant and Detective LaChance, leaving the jury with false impressions of the reasons for the termination of the informant's agreement. The court denied defendant's motion, standing by its earlier rulings that the evidence defendant sought to admit through Detective LaChance's testimony was inadmissible hearsay and extrinsic evidence prohibited by V.R.E. 608(b). The court rejected defendant's contentions that evidence concerning the reason for the informant's termination was admissible as "context" evidence, and that the evidence showed the informant's motive to lie about the controlled buy. The court concluded that defendant was able to bring out evidence that the informant's cooperation agreement was terminated, and that she was able to cross-examine the informant on "motive, bias and interest based on her agreement with the State."

## III.

¶ 18. On appeal, defendant argues that the court improperly limited her cross-examination of Detective LaChance regarding his reasons for terminating the informant's cooperation agreement — testimony defendant argues would have demonstrated that the informant had a motive to fabricate testimony during trial, would have provided the "complete picture" of the informant's cooperation with VDTF, and would have undermined the informant's credibility by showing she was not truthful.

¶ 19. ■ We review the trial court's evidentiary rulings deferentially and reverse "only when there has been an abuse of discretion that resulted in prejudice." *State v. Burke*, 2012 VT 50, ¶ 23, 192 Vt. 99, 54 A.3d 500 (internal quotation omitted). In light of the "paramount importance of cross-examination" to criminal defendants, *State v. Fuller*, 168 Vt. 396, 403, 721 A.2d 475, 481 (1998), a court's discretion in evidentiary matters is tempered by the duty to protect a criminal defendant's constitutional right to confront witnesses. *State v. Lawrence*, 2013 VT 55, ¶ 6, 194 Vt. 315, 80 A.3d 58.

¶ 20. Defendant challenges multiple rulings of the court — its refusal to admit the termination statement into evidence, and its refusal to allow various inquiries of Detective LaChance on cross-examination. Defendant argues generally that she was entitled to let the jury know that the informant's agreement was terminated by Detective LaChance on account of the traffic stop incident. Although defendant frames this as a single goal, through these various questions and proffers, defendant actually sought to establish two related but distinct facts: (1) that the informant lied to a police officer during a traffic stop by telling him she was in the middle of a controlled buy for VDTF; and (2) that Detective LaChance terminated her cooperation agreement because, based on what he learned about the traffic stop, he no longer considered her to be truthful.

## A.

¶ 21. ██ ██ The trial court's rulings as they relate to the first inference present easier questions. Detective LaChance had no firsthand knowledge of the traffic stop incident, and therefore could not testify about what happened during that traffic stop. See V.R.E. 602 ("The testimony of a witness may be excluded or stricken unless evidence is introduced sufficient to support a finding that [the witness] has personal knowledge of the matter."). Nor could he merely repeat allegations about the incident that were relayed to him by Trooper Duca. The trial court rightly concluded that such testimony would be hearsay, and thus inadmissible. V.R.E. 801, 802. In the absence of an actual witness to the traffic stop incident, defendant could not rely on testimony from Detective LaChance to show that the informant did, in fact, lie to law enforcement about her participation in a controlled buy at the time she was pulled over. Whatever constitutionally protected right defendant may have to elicit evidence showing a witness's motive to fabricate or otherwise impeaching a witness's credibility, it does not require a court to allow a defendant to introduce or elicit incompetent or hearsay testimony for the purpose of such impeachment. While the rules of evidence and the Sixth Amendment's Confrontation Clause generally protect similar values, "the Clause applies only to evidence that is relevant and otherwise admissible under the rules of evidence." *Lawrence*, 2013 VT 55, ¶ 6 n.2 (citing *State v. Fuller*, 168 Vt. at 403-04, 721 A.2d at 481).

¶ 22. Defendant does not grapple with the hearsay problem on appeal, instead offering theories as to why evidence of the incident is admissible pursuant to V.R.E. 404(b) to show defendant's motive, or to give the jury a complete picture. Even if evidence concerning the traffic stop incident could be admissible, defendant would still have to present it in an admissible form — and the description of an officer with no firsthand knowledge of the incident who could, at best, relay another officer's reports is not an admissible form. To the extent the trial court excluded the termination statement because it contained a hearsay account of the traffic stop incident, and insofar as the trial court precluded Detective LaChance from testifying about the traffic stop incident, we affirm the trial court's rulings.

## B.

¶ 23. The trial court's rulings relating to Detective LaChance's termination of the cooperation agreement present more challenging questions. The court allowed testimony that Detective LaChance terminated the informant's agreement, but declined to allow defendant to ask him about the reason for his decision. The focus of defendant's argument on appeal is not that evidence that the informant lied during the traffic stop is admissible in its own right; it is that evidence that Detective LaChance terminated her agreement because he lost confidence in her truthfulness following the traffic stop incident is relevant and admissible. From this perspective, the truth of the allegations concerning the traffic stop is less important than the consequences it triggered.

## 1.

¶ 24. Defendant first argues that the evidence, thus understood, was admissible to show motive. Specifically, defendant argues that testimony regarding the traffic stop and the ensuing termination of her initial cooperation agreement would have shown the jury that the informant had a motive to fabricate her statements about the controlled buy.

¶ 25. ■ ■ The U.S. Supreme Court has recognized that " 'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)).

Accordingly,

> a criminal defendant states a violation of the Confrontation Clause by showing that [he or she] was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.

*Id.* at 680 (quotation omitted). This Court has likewise recognized the Confrontation Clause's protection of appropriate cross-examination designed to expose a witness's motivations. *State v. Cartee*, 161 Vt. 73, 76-77, 632 A.2d 1108, 1110-11 (1993). Nonetheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; see also *Cartee*, 161 Vt. at 77, 632 A.2d at 1111 ("[T]he Sixth Amendment and Chapter I, Article 10 of the Vermont Constitution do not prevent a trial court from imposing reasonable limits on cross-examination into the partiality of a prosecution witness."). The Vermont Rules of Evidence reflect these principles. While V.R.E. 404(b) generally prohibits evidence of other crimes, wrongs or acts committed by a person offered to show the person acted in conformity with those other actions, it allows evidence of other acts when introduced for other purposes, such as proof of motive.

¶ 26. ■ Defendant argues that the fact that the informant's agreement was terminated because of her alleged conduct at the traffic stop is probative of her motive to fabricate testimony against defendant in this case. This argument is complicated by the fact that substantial evidence was admitted concerning the informant's motives. The jury heard testimony that the informant agreed to cooperate because she was facing up to thirty-five years in prison on unrelated charges and that her cooperation could help mitigate her sentence. The jury also learned that because of the termination of the informant's agreement, she was sentenced on her underlying charges but that sentence was deferred. The jury also heard that as a condition of the informant's deferred sentence, she was required to testify truthfully at trial and if she did

not, she would face potential imposition of her deferred sentence. The informant's stake in her cooperation was large, and the jury knew of the informant's ongoing risk if she violated the conditions of that cooperation. Given this record, the fact that the informant's agreement was terminated because of alleged misrepresentations during the traffic stop adds little, if anything, to the jury's meaningful understanding of all the forces at play in the informant's motive to testify.

¶ 27. Defendant attempts to overcome this obstacle by arguing that although the jury already knew that the informant had a motive to lie because of her bargain with the State for leniency, if they realized that she had lost her first deal because of her lies in the traffic stop, they could conclude that now she had an "even greater" incentive to protect the bargain with the State secured by her deferred sentence. Having blown her first cooperation agreement with the State, defendant argues, the informant was especially motivated to provide satisfactory testimony to preserve her second chance. Given that the jury knew that she engaged in the controlled buy as part of a deal with the State, that her initial deal was terminated, that her deferred sentence in connection with her own case was on the line in connection with her testimony in this case, and that she had provided a statement concerning the buy immediately after she left defendant's apartment — long before the traffic stop incident — we cannot conclude that the trial court abused its discretion in concluding that the excluded testimony lacked additional probative value with respect to motive.

2.

¶ 28. ■ Defendant next argues that the fact that the informant's cooperation agreement was terminated in response to the traffic stop incident provided context necessary to the jury's decision. This Court has recognized in criminal cases that evidence of other misconduct may be admitted if it is "part of the context of a crime charged where it is so interwoven with the crime charged it cannot be separated without skewing the narrative." *John A. Russell Corp. v. Bohlig*, 170 Vt. 12, 21, 739 A.2d 1212, 1220 (1999). We explained that evidence of other misconduct may be admissible if its exclusion would "leave gaps in the narrative detracting from its credibility." *Id.* On this basis, we reversed a conviction based on a controlled drug buy when the trial court

declined to allow cross-examination of the police officer concerning the informant's history of manipulating drug buys, including absconding with the buy money in one case, and in another providing the police with a substance he claimed was LSD when it was not. *State v. Findlay*, 171 Vt. 594, 595, 765 A.2d 483, 485-86 (2000) (mem.). We rejected the notion that the incidents other than the drug buy that gave rise to that prosecution were somehow collateral:

> Thus, rather than being simply a distracting issue, the overall picture of [the informant's] relationship with the police, the circumstances surrounding his cooperation, and the facts relevant to his role as an informant were highly probative of the integrity of the November 21 buy. Without evidence of [the informant's] actions in drug purchases both prior to and after November 21, the jury was left without the benefit of a reasonably complete understanding of the November 21 operation as presented by [the officer]; thus, cross-examination was significantly undermined.

*Id.* at 596, 765 A.2d at 486-87.

¶ 29. On the one hand, the traffic stop and subsequent termination of the cooperation agreement were not so interwoven with the controlled buy underlying defendant's charges that their exclusion disrupts the narrative of the case. The controlled buy happened weeks before the traffic stop and subsequent termination of the agreement. On the other hand, the jury's understanding of the relationship between the informant and law enforcement was in this case incomplete and potentially misleading. The jury learned about all the steps taken by the State to ensure the informant's reliability, including the extensive requirements of good behavior built into the code of conduct applicable to informants and the potential consequences for noncooperation, but it never learned that the State had concluded that the informant had not complied with her commitments. Instead, the jury heard the informant's testimony that her agreement to cooperate terminated because she felt "uncomfortable" and stopped returning Detective LaChance's calls. Detective LaChance's own testimony reinforced the informant's claim. He was allowed to testify that the informant stopped cooperating and that her agreement was terminated thereafter, but was not allowed to tie the termination to events

other than the informant's own purported decision to stop cooperating — leaving the distinct impression that the informant's decision to stop cooperating, rather than any concerns about her credibility on the part of law enforcement — led to her termination.

¶ 30. ▌ The misleading nature of the evidence was exacerbated by Detective LaChance's express vouching for the informant in the following exchange:

> State: But the fact that you enter into that contract, does that mean that you don't — you don't trust [the informant]?
>
> Detective LaChance: Doesn't mean that in the least.
>
> State: Would you have agreed to work with her if you didn't trust her?
>
> Detective LaChance: I wouldn't have worked with her.

The State introduced testimony from Detective LaChance that he would not have worked with the informant if he did not trust her, suggesting in no uncertain terms that he did, in fact, trust her, without letting defendant elicit testimony that Detective LaChance did *not* actually trust her, and that is why he stopped working with her. It is not the absence of information about the traffic stop that renders the jury's picture incomplete. Because the State elicited only part of the story concerning Detective LaChance's relationship with and confidence in the informant, the jury was left with a clear misimpression that Detective LaChance trusted the informant and believed her to be truthful — an impression that was 180 degrees from the truth as reflected in the evidence proffered by defendant. For that reason, the trial court's refusal to allow defendant to ask Detective LaChance whether he ultimately thought that the informant could cooperate in the investigation honestly and truthfully — a question not designed to elicit any testimony about the traffic stop — impermissibly "skew[ed] the narrative" with respect to the central issue in this case — namely, the informant's credibility. See *John A. Russell Corp.*, 170 Vt. at 21, 739 A.2d at 1220.

¶ 31. In contrast to prior questions and proffers by the defendant, the critical question defendant was not allowed to ask — "You thought she couldn't cooperate in this investigation honestly and

truthfully?" — did not seek to elicit a hearsay report about the traffic stop incident. Rather, it sought to elicit Detective LaChance's opinion of the informant's truthfulness — a subject about which he had already offered incomplete if not outright misleading testimony. To the extent that the trial court excluded the question on the basis of a hearsay exception, we conclude the question did not call for hearsay testimony.

¶ 32. ▮▮ ▮▮ For similar reasons, we reject the trial court's Rule 608 analysis of this question. We have serious doubts as to whether the fact that Detective LaChance formed his revised opinion as a result of a specific incident means that the opinion itself, without reference to the incident, is subject to the constraints of Rule 608(b), which limits admissibility of extrinsic evidence of specific instances of the conduct of a witness for impeachment purposes.[2] Rule 608(a) regulates — and generally allows — opinion and reputation evidence of character. However, even if Rule 608(b) did apply because a specific instance of conduct underlay Detective LaChance's opinion, Rule 608(b)(2) gives a court discretion to allow questions about specific instances of the conduct of a witness in cross-examination of another witness who has testified about that witness's character for truthfulness or untruthfulness. In the face of Detective LaChance's vouching for the informant's credibility, the court's refusal to allow defendant to ask Detective LaChance whether he had come to distrust the informant exceeded the court's discretion under Rule 608(b)(2). We cannot uphold the court's exclusion of the question on the basis of Rule 608.

¶ 33. Accordingly, we reverse and remand the case for a new trial.[3]

*Reversed and remanded.*

---

[2] In fact, the dissent argues that if the jury had insufficient information or was somehow misled about the reason for terminating the informant, it was due to defendant's failure to ask Detective LaChance his opinion of the informant's truthfulness at the time he terminated her — a question the dissent concedes would have been admissible pursuant to V.R.E. 608(a). See *post,* ¶ 46. But the primary proffered and rejected question that underlies this appeal was virtually indistinguishable from the query the dissent acknowledges would have been permissible.

[3] Because we reverse on this evidentiary basis we do not reach defendant's arguments that her conviction was based on testimony the prosecution knew or

¶ 34. **Reiber, C.J.,** dissenting. In this case, the jury convicted defendant based on evidence that included testimony from a confidential informant who was terminated for unrelated reasons after participating in the controlled buy in this case. The majority concludes the trial court erred in limiting certain evidence surrounding the informant's termination. But the jury had ample evidence with which to weigh the informant's credibility and was not misled by the State. Defendant here asks this Court to second-guess the jury's credibility determination. This we should not do. Therefore, I respectfully dissent.

¶ 35. I agree with the conclusion that the trial court properly excluded the informant's termination report as well as defendant's cross-examination questions of Detective LaChance regarding the subsequent and unrelated traffic stop that led to the informant's termination. Defendant's attempt to admit this evidence in either form was designed to elicit inadmissible hearsay, since the detective was not present at the traffic stop and therefore had no firsthand knowledge of the incident. See V.R.E. 602 (allowing exclusion of testimony of which a witness has no personal knowledge), 801 (defining hearsay). Moreover, the specifics of that incident were inadmissible even if the evidence had not been hearsay. Under Vermont Rule of Evidence 608(b), "[e]vidence of specific instances of conduct offered to attack the witness's credibility are not admissible through other witnesses as a matter of law." *John A. Russell Corp. v. Bohlig,* 170 Vt. 12, 22, 739 A.2d 1212, 1220 (1999) (citing 28 C. Wright et al., Federal Practice and Procedure § 6117, at 88 (1993)). Extrinsic evidence of the informant's unrelated conduct could not be admitted through the detective to impeach the informant's credibility — it had to be admitted through the informant herself, in the discretion of the trial court. See *id.*

¶ 36. The majority also properly rejects defendant's argument that the informant's termination was probative of her motive to fabricate her testimony under Rule 404(b). Defendant's contention

should have known was false. Nor do we address defendant's argument that the court should have permitted her additional cross-examination of the informant regarding the heroin allegedly found during the August 2010 traffic stop. Because we do not address the latter issue, we need not rule on the State's motion for judicial notice of the docketing information and charging documents in a separate action involving informant's passenger and arising from the August 2010 traffic stop.

is simply illogical because the informant's termination, which defendant claims gave rise to her motive to fabricate, occurred *after* the controlled buy from defendant and thus could not have influenced the events that day or her testimony consistent with those events at trial. Cf. *In re A.B.*, 170 Vt. 535, 536-37, 740 A.2d 367, 369-70 (1999) (mem.) (reversing and remanding for new trial where defendant had demonstrated that alleged victim's motive to fabricate might have arisen before victim reported sexual abuse, but was not permitted to explore the events giving rise to motive).

¶ 37. The majority is then taken, however, with defendant's claim that the trial court erroneously refused to admit evidence of the reasons for informant's termination — either through the informant termination form or the detective's testimony about the contents of the form — when it concludes this evidence should have been admitted because it was "so interwoven with the crime charged it [could] not be separated without skewing the narrative." *John A. Russell Corp.*, 170 Vt. at 21, 739 A.2d at 1220. The majority reasons that, "[b]ecause the State elicited only part of the story concerning Detective LaChance's relationship with and confidence in the informant, the jury was left with a clear misimpression that Detective LaChance trusted the informant and believed her to be truthful." *Ante,* ¶ 30.

¶ 38. This analysis errs for several reasons. First, as the majority acknowledges, the traffic stop leading to the informant's termination was not "interwoven with the crime charged" in the sense contemplated by *John A. Russell Corp.* In that case, we held that an employee's previous termination for dishonesty was not "interwoven" with his later breach of contract claim against a different employer, and that evidence of the previous termination could "be excluded without affecting the narrative on the breach of contract at all." *Id.* at 21-22, 739 A.2d at 1220. The majority fails to distinguish the facts of *John A. Russell Corp.* from the instant case. Here the informant's termination was, without dispute, for an unrelated incident, which occurred long after the subject event and was completely unrelated to the controlled buy in this case.

¶ 39. Moreover, although the majority relies for its "context" proposition on *State v. Findlay*, the facts of that case are different. 171 Vt. 594, 765 A.2d 483 (2000) (mem.). There, prior to trial, the court excluded all evidence of prior controlled buys by the informant on the State's motion, and, in addition, the infor-

mant was never called as a witness at trial and was therefore never subject to impeachment on cross-examination, a distinct difference. *Id.* at 596, 765 A.2d at 486-87. That difference is compounded by our later clarification that *Findlay*'s reasoning implicates cases involving "a total deprivation of the opportunity to show the witness's bias." *State v. Brochu*, 2008 VT 21, ¶ 87, 183 Vt. 269, 949 A.2d 1035. "By contrast, we have been particularly supportive of restrictions on cross-examination when the defendant wanted to explore details of criminal conduct or other misconduct that was irrelevant or only marginally relevant to the charges against the defendant." *Id.* Defendant here clearly had the right to attack informant's credibility, and she was not deprived of the opportunity to do so as in *Findlay*. The exclusion of other evidence of specific conduct of the informant after the controlled buy did not improperly restrict the opportunity for impeachment. The trial court applied the rules of evidence by limiting the scope of defendant's efforts to impeach. The rules of evidence prohibit the introduction of unrelated instances of specific conduct because they " 'possess[ ] the greatest capacity to arouse prejudice' . . . [and] can undermine accurate fact finding ·because of the tendency of juries to give [them] too much weight." *John A. Russell Corp.*, 170 Vt. at 23, 739 A.2d at 1221 (quoting Advisory Committee Note to F.R.E. 405). For this reason, courts should be especially wary of allowing otherwise inadmissible evidence of specific conduct to be introduced as "context."

¶ 40. Second, the jury was not misled about the informant's relationship with law enforcement. In making her context argument, defendant cherry-picks isolated testimony while ignoring the rest of the record before the jury. The jury learned of the origin of the informant's deal with law enforcement: the informant initiated contact with police requesting to cooperate in exchange for consideration for leniency on several pending felony charges related to a burglary. The informant's signed contract was admitted into evidence at trial. The jury heard that informant initially faced thirty-five years of imprisonment on her pending felony charges, but ultimately received a deferred eighteen-month sentence. Testimony was introduced that, as part of the deferred sentence agreement, she was required to testify in defendant's trial and ultimately the charges would be removed from her record. As the majority concedes, "[t]he informant's stake in her cooperation was large, and the jury knew of the informant's

ongoing risk if she violated the conditions of that cooperation." *Ante,* ¶ 26. Moreover, the informant herself admitted in her testimony that she selected defendant as a target for investigation and that she did not personally like her.

¶ 41. The jury also heard evidence of law enforcement's perception of the informant's truth telling and the level of trust between them. The jury heard about the numerous steps taken to corroborate the information given by the informant according to standard operating procedure, including the signing of the confidential-informant contract outlining informant's responsibilities, surveillance of informant by numerous officers at the time of the controlled buy, and thorough pat-downs both before and after the buy. The jury learned of the Drug Task Force's plan to use informant's controlled buy from defendant to establish probable cause for a wire warrant to record future buys, a plan thwarted by informant's termination.

¶ 42. Most pertinently, the jury heard the details of the incident giving rise to the informant's termination. Detective LaChance confirmed that the informant had not stopped cooperating voluntarily but had been terminated. Detective LaChance testified that although he trusted the informant *at the time of the controlled buy,* he ultimately chose to terminate her cooperation agreement several weeks afterward. He testified that he would never work with an informant he did not trust. He testified to the steps he took to terminate, including filling out a termination form to place in her informant file and informing the prosecutor on the informant's case that she had been terminated. The jury heard from both Detective LaChance and the informant that the detective attempted to contact the informant to let her know she had been terminated, but that she did not respond to his calls.

¶ 43. Although defendant was not able to introduce all of the details of the informant's traffic stop through the cross-examination of Detective LaChance, evidence about the stop eventually came in through the testimony of the informant herself on cross-examination by defendant's attorney. Informant testified that she stopped cooperating with law enforcement simply because she "felt uncomfortable" and stopped returning Detective LaChance's calls. But this opened the door for defendant to try to impeach her by showing that it was circumstances surrounding the traffic stop that led to her termination, as evidenced by the following exchange:

Defense counsel: Do you recall being stopped by the police on August 20th?

Informant: Yeah.

Defense counsel: And you were with a friend?

Informant: Yeah.

Defense counsel: On that date, isn't it true that you lied to the police by telling them that you were working with the Task Force in the middle of a controlled buy?

Informant: No, I did not say that.

. . . .

Defense counsel: Do you recall telling the officer that you were hanging out with this person because you thought they had drugs on them?

Informant: No.

. . . .

Defense counsel: This is in the deposition, where you said, "I guess I said something about the reason I'm hanging out with this person is because I think he has drugs on him, yes." In error?

. . . .

Informant: Yes, I did. I did say that in the deposition, but with the whole — the police incident, I didn't say that to the police officer.

¶ 44. Admittedly, the testimony from the informant at trial on cross-examination was disjointed, loaded with contradiction and at times difficult to follow. But this in itself is revealing. To summarize, several officers, including Detective LaChance, testified that the informant was terminated for reasons that were left unstated before the jury, but Detective LaChance also testified he would not work with an informant he did not trust. In contradiction, the informant testified that she stopped working with the Task Force because she became "uncomfortable." On cross-examination, the informant agreed she purposely stopped returning the detective's phone calls. She testified that about a month after defendant's buy, she was stopped while driving without a license with a

passenger in her car, and that drugs were found as a result of the stop. And while informant denied it when shown her prior deposition testimony stating that she told police at the traffic stop that she was working with the Task Force, she also confirmed that she had stated in her deposition testimony that she told the police officer during her stop that she was with that particular passenger because she believed he had drugs on him.

¶ 45. In total, this is not a record that requires a new trial. This is evidence of an evasive witness admitting to certain facts that go to the heart of defendant's objections before us, sufficient for the jury to question the informant's story and her reliability and to infer that the informant was terminated because she was considered unreliable and untrustworthy by law enforcement. The jury was not deprived of the opportunity to determine the informant's credibility based on these facts; it simply made a credibility determination that was unfavorable to defendant. This credibility determination was soundly within the province of the jury and not for us to disturb on appeal. *State v. Johnson*, 2013 VT 116, ¶ 27, 195 Vt. 498, 90 A.3d 874 ("We are not triers of fact, and we will not substitute our judgment for that of the jury.").

¶ 46. The majority errs for a third reason. If the jury had insufficient information or was somehow misled about the reason for terminating informant, it was due to defendant's failure to ask the right questions on cross-examination, not due to the trial court's evidentiary rulings. Defendant could have asked Detective LaChance his opinion of informant's truthfulness at the time he terminated her. See V.R.E. 608(a) ("The credibility of a witness may be attacked . . . by evidence in the form of opinion or reputation, but subject to [the limitation that] the evidence may refer only to character for truthfulness or untruthfulness . . . .").

¶ 47. But defendant did not take this tack. Instead, she repeatedly questioned Detective LaChance about the specific circumstances surrounding the traffic stop. Even her inquiry, relied on by the majority, as to whether Detective LaChance believed the informant could "cooperate honestly and truthfully" in the investigation was unequivocally probative not of the informant's character for truthfulness, but rather of her conduct during the traffic stop. Only in hindsight on appeal does defendant attempt to contort this line of questioning into one of opinion under Rule

608.[4] As the majority notes, defendant's constitutional right to confront adverse witnesses does not provide her carte blanche to elicit inadmissible testimony. *State v. Larose*, 150 Vt. 363, 369, 554 A.2d 227, 231-32 (1988) ("'Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). Defendant could have elicited her desired testimony in an admissible form but failed to do so.

¶ 48. In short, defendant did not have a constitutional right to introduce inadmissible testimony, and the trial court did not err in excluding it. The trial court's ruling limiting cross-examination of Detective LaChance and refusing admission of the termination report was not error. If not clear through the cross-examination of the informant, defendant *could have* made her point — that informant was terminated due to her untrustworthiness — by eliciting Detective LaChance's opinion under 608(a). Given these

---

[4] The majority claims that the question defendant was not permitted to ask — "You thought she couldn't cooperate in this investigation honestly and truthfully?" — was "virtually indistinguishable" from a question regarding informant's character for truthfulness. *Ante*, ¶¶ 31-32 & n.2. Nothing could be further from the truth, as defendant's question was rooted exclusively in the informant's conduct on a specific occasion, and in Detective LaChance's decision to terminate her because she "couldn't cooperate in this investigation honestly and truthfully" based on that specific incident.

Moreover, the majority claims that even if the excluded question related to informant's specific conduct, it would nevertheless be admissible under Rule 608(b)(2) as evidence of specific conduct used to impeach the testimony given by a witness on cross-examination regarding another witness's character for truthfulness or untruthfulness. In short, the majority essentially contends that Detective LaChance opened the door by "vouching" for the informant's credibility on direct examination, so that it was fair game for defendant to impeach his testimony with specific instances of conduct on cross-examination. *Ante*, ¶ 32. However, it is a stretch to say that Detective LaChance vouched for informant's credibility. The direct examination contains a brief exchange where, in response to the State's question about whether the requirement that the informant sign a cooperation agreement means law enforcement does not trust her, Detective LaChance answered "I wouldn't have worked with her [if I didn't trust her]." This statement was elicited, not volunteered, and solely related to whether he trusted the informant while he worked with her — at the time of the controlled buy. Such a statement, without more, is hardly a resounding endorsement of the informant's credibility in general, and in fact, the jury could easily infer that Detective LaChance no longer trusted her by virtue of the fact that he terminated her agreement several weeks later.

circumstances, even if the trial court had erred in its evidentiary ruling — which it did not — there was no prejudice to defendant and any such error would have been harmless beyond a reasonable doubt. See *State v. Fellows*, 2013 VT 45, ¶ 23, 194 Vt. 77, 76 A.3d 608 (reciting the standard for a harmless-error analysis). For these reasons, I would affirm the trial court.

¶ 49. I am authorized to state that Judge Crawford joins this dissent.