NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 17

No. 2017-281

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Criminal Division |
| | |
| Mark Bergquist | October Term, 2018 |

Michael S. Kupersmith, J. (Ret..)

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Richard R. Goldsborough, South Burlington, and David Carico, El Segundo, California, for Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **ROBINSON, J.** Defendant appeals his jury conviction for sexually assaulting his seven-year-old daughter, A.B. On appeal, defendant raises a host of arguments challenging the trial court's (1) admission of A.B.'s out-of-court statements pursuant to Vermont Rule of Evidence 804a, (2) exclusion of certain evidence concerning A.B.'s mother's state of mind and conduct, (3) ruling allowing A.B. to testify out of defendant's presence pursuant to Vermont Rule of Evidence 807(f), (4) denial of discovery of some of A.B.'s mental-health records, and (5) admission of expert testimony that he argues improperly "vouched" for A.B.'s credibility. We affirm.

¶ 2.     This case began in December 2015 when mother reported to law enforcement that her daughter, A.B. (born Nov. 11, 2008), said that defendant had sexually abused her.  Defendant and mother had been on-and-off romantic partners for a number of years, and defendant was A.B.'s father.  After an investigation, including an interview of A.B. by a detective from the Chittenden Unit for Special Investigations, the State charged defendant with two counts of aggravated sexual assault of a victim under thirteen years pursuant to 13 V.SA. § 3253(a)(8).  The evidence at trial included testimony by mother, defendant, expert witnesses for both sides, the detective who initially interviewed A.B. and defendant, and the physician who examined A.B. following the report, a video recording of the detective's initial interview of A.B., and a video recording of A.B.'s own trial testimony.  The jury convicted on both counts, and the court sentenced defendant to thirty to fifty years on each count, to be served concurrently.

¶ 3.     We consider each of defendant's challenges on appeal, expanding on the factual and procedural background as relevant.

I.   A.B.'s Out-of-Court Statements

¶ 4.     Defendant challenges the trial court's determination that A.B.'s videotaped out-of-court statements to Detective Rene Young were admissible under Vermont Rule of Evidence 804a.

¶ 5.     Rule 804a allows out-of-court statements by a child under twelve to be admitted into evidence in a proceeding where the child is the alleged victim of a sexual assault, "the statements were not taken in preparation for a legal proceeding," the child is available to testify in court or under Rule 807, and "the time, content and circumstances of the statements provide substantial indicia of trustworthiness."  V.R.E. 804a(a).  Defendant argues that the statements to Detective Young did not meet Rule 804a's requirement that "the time, content and circumstances of the statements provide substantial indicia of trustworthiness."

¶ 6.     The trial court made the following findings in considering the State's motion to allow admission of A.B.'s out-of-court statements under Rule 804a.  Defendant and A.B.'s mother

2

had an unhealthy relationship throughout 2015, and on December 13, 2015, they had a long argument while home with A.B. During the argument, defendant taunted mother with the accusation that mother had molested A.B., and he said he should report her to the police. In fact, mother did later tell the police that when A.B. was an infant, under coercion by defendant, mother took photographs of herself "inappropriately touching" A.B. and sent them to defendant. Mother testified that on the night of December 13, defendant would not leave her alone, and he kept arguing with her and asking her to have sex with him. She eventually called an adult-crisis hotline. After her call to the hotline, mother took A.B. to a grocery store to get snacks. At the grocery store, A.B. was not listening to mother, so mother sat her down and asked if how she was acting had anything to do with the fight. A.B. said no. Mother said A.B. seemed nervous—she was fidgeting, kicking her legs, and playing with her belly button. Mother asked A.B. if defendant had hurt her. A.B. said he had grabbed her arm, but did not say defendant had done anything else. Mother had asked A.B. in the past if defendant had hurt her, but A.B. had always said he hadn't.

¶ 7.    Mother then asked if defendant had ever told A.B. not to tell about something because she could be taken away. A.B. froze. Mother told A.B. a couple times that if anything had happened, she needed to know so she could keep A.B. safe. A.B. then whispered into her ear "we had sex." Mother testified that she was shocked. She asked A.B. if she knew what sex was, and what a penis was, and A.B. said yes to each. Mother was shocked to hear that too. She asked A.B. where defendant had touched her, and A.B. spread her legs and pointed to her genitals. Mother asked how many times it had happened, and A.B. said it happened once over the summer. Mother asked twice if A.B. was sure, and A.B. finally said it might have happened a couple of times. Mother then called the police.

¶ 8.    A.B. was placed in the custody of the Department for Children and Families (DCF) on an emergency basis. The next day, Detective Young conducted a forensic interview with A.B. The interview was videotaped. At the beginning of the interview, Detective Young asked A.B.

3

questions to establish that A.B. could tell the difference between truth and lies, and had A.B. promise to tell the truth. Eventually, A.B. told Detective Young that defendant put his "gina" in her "gina," and gave details as to how it happened. When Detective Young asked what "gina" meant, A.B. pointed to her genitals, and said it was used for sex and "to go potty." She also said that defendant had put his "gina" in her "gina" on a second occasion, this one at night, but did not provide further details.

¶ 9. The State moved to allow admission of both A.B.'s statements to mother and to Detective Young; defendant opposed the admission of both. The court held that A.B.'s statements to mother were not admissible because their circumstances—including that defendant had threatened to report mother to the police for sexually assaulting A.B. shortly before A.B. made the statements—did not provide substantial indicia of trustworthiness, as Rule 804a(a)(4) requires. It noted, however, that this ruling reflected only that the State had not met its burden of establishing that the circumstances provided sufficient indicia of trustworthiness, and was not a decision as to the veracity of the statements. The court did allow admission of A.B.'s statements to Detective Young, as it found their time, content, and circumstances bore substantial indicia of trustworthiness.

¶ 10. In connection with the latter conclusion, the court credited the testimony of the State's expert, Dr. Halikias, concerning the protocols for such interviews. The court found that A.B. "appeared consistent about the disclosures throughout the interview," and appeared reluctant and hesitant. The court found that she "looked uncomfortable and at times frightened," and her whispered disclosure to Detective Young was "convincing." The court concluded that "despite some flaws in the detective's questioning style, the flaws did not affect the validity or reliability of the interview" because A.B. "did not appear manipulated by the flawed questions and resisted leading and repeated questioning."

4

¶ 11. On appeal, defendant argues that the trial court erred in finding the circumstances of A.B.'s statements to Detective Young trustworthy. He argues that mother coerced A.B. into making the statements the night before, and that A.B.'s statements to the detective were contaminated by that coercion. Defendant preserved this issue for appeal.

¶ 12. The trial court's decision to admit A.B.'s statements under Rule 804a was a discretionary one, which we review deferentially and would reverse only upon finding abuse of discretion. State v. Felix, 2014 VT 68, ¶ 19, 197 Vt. 230, 103 A.3d 927. The determination of trustworthiness under Rule 804a(a)(4) is a factual finding, which this Court will not overturn unless clearly erroneous. State v. Gallagher, 150 Vt. 341, 348, 554 A.2d 221, 225 (1988).

¶ 13. In determining whether the circumstances of a child's statement have the indicia of trustworthiness required for admission under Rule 804a(a)(4), a court "may consider such factors as: the circumstances of the initial disclosure, including the setting and person to whom the disclosures were made; internal consistency and detail of disclosures; timing and conduct of interviews, including whether nonleading questions were asked; freshness and spontaneity of disclosures; appropriate body language; risk of fabrication" and "evidence of coercion or manipulation" as well as "accuracy of peripheral detail; the child's affect, intelligence, memory, and concern for the truth; and corroboration by medical and other evidence." State v. Pratt, 2015 VT 89, ¶ 7, 200 Vt. 64, 128 A.3d 883.

¶ 14. We conclude that the trial court's finding that A.B.'s statements to Detective Young bore sufficient indicia of trustworthiness was not clearly erroneous. Evidence supporting this conclusion includes the State's expert's testimony that conduct of the interview was reasonably sound, despite some violations of the accepted interview protocol; A.B.'s word choice and body language, which the trial court could reasonably find supported her credibility; A.B.'s apparent resistance to leading questions when asked; and the fact that A.B., then a seven-year-old child, made reasonably consistent and at times graphic disclosures. See State v. LaBounty, 168 Vt. 129,

5

138, 716 A.2d 1, 7-8 (1998) (holding that young children's graphic accounts of sexual abuse to caseworkers and police officers, made the day after their initial disclosures to their mothers, supported finding that statements were trustworthy). Accordingly, we find no abuse of discretion in the trial court's decision to admit A.B.'s statements to Detective Young under Rule 804a.

¶ 15. We understand defendant's view that none of these indicia of trustworthiness is sufficient to surmount the contamination arising from mother's coercion of A.B. the night before, but conclude that the trial court's exclusion of A.B.'s out-of-court statements to mother does not undermine its admission of the statements to Detective Young. The trial court emphasized that its decision to exclude A.B.'s out-of-court statements to mother rested on the State's failure to meet its burden of showing that the time and circumstances of A.B.'s disclosure to mother provided substantial indicia of trustworthiness. The court noted that the content of the actual disclosure to mother, and the child's behavior and reluctance to disclose, as reported by mother, were factors that provided some support for the trustworthiness of the statements. However, in light of the unhealthy relationship between mother and defendant and defendant's threats to report mother for sexual abuse shortly before A.B.'s disclosure to mother, the court concluded the State had not met its burden. The trial court did not find that mother coerced A.B.'s initial reports the night before, and the evidence, while it may support such an inference, does not compel such an inference. Accordingly, the court's conclusion that the statements to Detective Young were trustworthy, which implicitly rejected the claim that the statements were irretrievably contaminated by mother's questioning of A.B. the night before, was not clearly erroneous.[1]

---

[1] Defendant also suggests that A.B.'s statements to Detective Young in the investigative interview may also have been the result of prior suggestion or coercion by Detective Young, pointing to an exchange at the beginning of the investigative interview when Detective Young said "I met you last night; we talked a whole bunch" and A.B. replied, "Because you made me." The evidence supporting defendant's suggestion that Detective Young contaminated A.B.'s testimony through their conversations the night before is sparse at best. The only evidence is that Detective Young made small talk with A.B. about matters other than the allegations at issue. The trial court's failure to infer on the basis of this evidence that Detective Young contaminated A.B.'s reports and

6

## II. Evidence of Mother's Mental Illness and Alleged Assault

¶ 16.    Defendant argues that the exclusion of certain evidence of mother's "mental illness and her aggravated assault" on A.B. deprived him of his constitutional rights to confrontation and to present a defense under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution and Chapter I, Article 10 of the Vermont Constitution.

¶ 17.    The background relevant to this claim is as follows.  In broad terms, defendant's theory of the case, beyond his general denial, is that mother coached A.B. to make the allegations because she thought defendant was going to report her for sexually abusing A.B. and she sought to preempt and divert attention from that report.  In particular, around 2009, when A.B. was an infant, mother took photos of herself touching A.B.'s vagina with her fingers and mouth.  (Mother has subsequently alleged that defendant forced her to take these pictures and send them to him.)  This happened while mother was enrolled in a residential parenting program.  When her counselor at the program asked her about the photos mother had taken, mother lied to her counselor, claiming that they were of her breastfeeding.  On the day in December 2015 when A.B. later made her disclosure, defendant called mother a child molester in the context of a fight.  After the fight, mother called a mental-health crisis line.  She then took A.B. to the store, where mother said A.B. made her disclosure to mother.  Mother reported A.B.'s allegations against defendant shortly thereafter.  At that time, she also disclosed her own prior (2009) sexual assault of A.B. to the police.  Subsequently, while this case was pending, during a supervised visit with A.B. mother told A.B. about the 2009 assault and said to A.B. that defendant had made her (mother) do it.  Although mother denied to the DCF caseworker that she made any such disclosure, the caseworker observed that A.B. provided a high level of detail about the disclosure.  Finally, mother has a history of

---

undermined the trustworthiness of A.B.'s recorded statements to Detective Young was not clearly erroneous.

significant mental-health issues. Defendant argues that these events show mother's motive to coach A.B. to make a false report against him and also undermine mother's credibility generally.

¶ 18. In connection with these matters, the parties made a series of motions pretrial, which we discuss more fully as they are relevant to particular rulings.

¶ 19. At trial, the court admitted considerable evidence relating to mother's mental health, but stated that defendant could not introduce evidence of mother's "mental health status as such" because it was not relevant. The court allowed defendant to introduce evidence suggesting that mother had mental-health concerns, including that mother had in the past seen a mental-health professional, had attempted suicide, and had called a mental-health crisis line the night A.B. disclosed defendant's sexual abuse of her. It also allowed evidence that mother and defendant had in the past argued about mother's mental health and her refusal to seek therapy.

¶ 20. Likewise, the trial court ultimately allowed defendant to introduce evidence relating to mother's alleged assault of A.B. and some of her subsequent statements about it.[2] On the stand, mother admitted that she had taken pictures of herself inserting her finger into A.B.'s vagina when A.B. was an infant. She conceded that was why defendant called her a child molester, and that she told the police about it on the evening that she called to report defendant's abuse of A.B. because she "thought it would be best to get it out" herself "rather than have [defendant] report it." The court also admitted A.B.'s testimony that mother had told A.B. that when A.B. "was a little baby or girl . . . my dad made my mom stick her finger in my private." The court also allowed defendant to ask mother on the stand if she had told A.B. this.

---

[2] Mother initially asserted her Fifth Amendment right against self-incrimination, but the court concluded that she waived that right through her answers to questions on cross-examination.

8

¶ 21. On appeal, defendant challenges six specific rulings or clusters of rulings that he argues denied him the opportunity to fully present his defense.[3]

¶ 22. "We review the trial court's evidentiary rulings deferentially and reverse only when there has been an abuse of discretion that resulted in prejudice." Felix, 2014 VT 68, ¶ 19 (quotation omitted). We will find an abuse of discretion only upon a showing that "the court's discretion was either withheld or exercised on clearly unreasonable grounds." State v. Cartee, 161 Vt. 73, 76, 632 A.2d 1108, 1110 (1993). Recognizing the constitutional issues at play when a criminal defendant is prevented from introducing evidence to impeach an opposing witness or call into question a witness's motive, our "analysis of whether the trial court abused its discretion . . . is further amplified by defendant's constitutional right to confront witnesses against him." Id. With these standards in mind, we consider each of defendant's respective challenges on appeal.

A. Testimony from Detective Young Regarding Mother's Admission

¶ 23. Defendant argues that the trial court erroneously declined to allow him to call Detective Young to testify that mother admitted to Detective Young on the night of A.B.'s initial disclosure of abuse that she, mother, had previously sexually abused A.B.

¶ 24. The ruling at issue followed a discussion at the bench on the second day of trial. Defendant was seeking to highlight mother's statements to A.B. about the prior assault, and mother's denial to the DCF caseworker that she made those statements. Defense counsel asked

---

[3] Because defendant's briefs described various categories of evidence defendant claimed were erroneously excluded, but did not identify with clarity or citations to the record the specific rulings challenged on appeal, at oral argument the Court requested that defendant provide a list of the specific rulings he challenges on appeal. In identifying the rulings at issue on appeal, we rely on defendant's response. Some other challenges raised in defendant's briefs but not identified in his post-argument list of specific rulings challenged relate to claimed rulings that apparently never existed. For example, defendant argues in his brief that he wanted to introduce evidence that mother was facing charges for aggravated assault when she testified against defendant, and that she was not offered a plea deal until after testifying against him, which would have been evidence of her motive to testify against him and would have impeached her credibility. Defendant never sought to introduce such evidence before the trial court. He cannot now claim that he should have been allowed to introduce evidence that he did not seek to introduce. V.R.E. 103(a)(2).

whether he could call Detective Young to say that at the interview, mother said that she had touched A.B.'s vagina, and then call A.B.'s foster mother to testify that A.B. had reported that mother had disclosed this prior abuse during a visit. The court noted that A.B. had already testified to these events and concluded that defendant did not need to bring in Detective Young to repeat that.

¶ 25. The trial court has considerable discretion to refuse to allow cumulative evidence. Pcolar v. Casella Waste Sys., Inc., 2012 VT 58, ¶ 9, 192 Vt. 343, 59 A.3d 702, as amended on denial of reh'g (Aug. 28, 2012).

¶ 26. Here, even if the court abused its considerable discretion in denying defendant the opportunity to elicit from Detective Young testimony about matters that were already in the record, defendant was not prejudiced by the ruling since mother herself subsequently testified that at the time she reported A.B.'s disclosures, she told Detective Young that she, mother, had committed the prior acts. This is essentially the same testimony defendant sought to elicit from Detective Young. The fact that mother made this disclosure to Detective Young was clear to the jury and undisputed. Accordingly, defendant suffered no prejudice from the court's exclusion of the additional testimony, and any error was harmless. See V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); State v. Haskins, 2016 VT 79, ¶¶ 17, 28, 202 Vt. 461, 150 A.3d 202 (holding error is harmless if it is beyond reasonable doubt that jury would have convicted even had error not occurred, given strength of case without excluded evidence, and strength of excluded evidence, taking into account whether it was cumulative or duplicative).

B. Testimony from Detective Young Regarding Mother's Inconsistent Statement

¶ 27. Defendant challenges the trial court's exclusion of a prior inconsistent statement mother made to Detective Young. The background is as follows. During mother's testimony, after mother described the photos she took of herself abusing A.B. when A.B. was an infant,

defendant elicited mother's confirmation that she had made a report about the incident when she was at the residential program where it happened. In connection with that report, defense counsel asked mother, "Isn't it true that . . . you told [your counselor] that you had not taken the pictures that you just described?" Mother responded, "I had told her that I thought I did, but wasn't sure, and she said that if—if I actually did it, she thinks I would have remembered." Defendant also elicited testimony from mother that DCF interviewed her following this report and did not substantiate her for abuse. Mother admitted that DCF's report indicated that mother said she only took pictures of herself lying down without a top and A.B. sitting in a diaper on her stomach, but said she did not remember saying that to DCF. On appeal, defendant argues that the trial court improperly excluded evidence of mother's statement to Detective Young that she had previously told her counselor at the residential program that she sexually abused A.B.

¶ 28. Although defendant identifies this argument in his post-argument list of rulings at issue on appeal, nowhere in his appeal briefs does he provide a record citation to the court's contested ruling on this point so we can review it.[4] See V.R.A.P. 28(a)(4)(A) (appellant's brief must contain "the issues presented, how they were preserved, and appellant's contentions and the reasons for them—with citations to the authorities, statutes, and parts of the record on which the appellant relies").

¶ 29. Nor does he point us to his request to call Detective Young for this purpose and his proffer as to what Detective Young was expected to say. See V.R.E. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [where] the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions

---

[4] Defendant provides a transcript of an audiotaped interview of mother by Detective Young in which mother claims to have accurately described the photos to the counselor many years prior, but this citation does not tell us where, if anywhere, the trial record reflects an attempt by defendant to elicit this evidence in the trial.

11

were asked."). Defendant did not attempt to question Detective Young about the purported inconsistent statement by mother when Detective Young testified during the State's case in chief, nor when she testified in the State's rebuttal case. Defendant has not pointed us to an instance when he sought to call Detective Young in his own case for the purpose of asking this question. Because defendant has not identified a request, proffer, and ruling for us to review, we cannot conclude that the trial court committed error.[5]

## C. Testimony of Counselor

¶ 30.    In connection with the same issue, defendant sought to call the counselor from the program mother was enrolled in to testify that mother had told the counselor back in 2010 that the pictures mother had taken and sent to defendant were essentially benign, and that mother did not disclose the sexually abusive nature of the pictures to the counselor. In declining defendant's request, the court explained that mother had already admitted to committing the 2009 acts, and the proffered testimony showing that mother lied about them to her counselor in 2010 would add little.

¶ 31.    While constitutional concerns do limit the trial court's discretion to exclude evidence impeaching the credibility or exposing the bias of a witness such as mother, the court's ruling denying defendant's request to call the counselor for this purpose was well within its discretion. The Confrontation Clause limits trial courts' discretion to restrict impeachment of a key prosecution witness's credibility. Cartee, 161 Vt. at 76, 632 A.2d at 1111. This is because the purpose of confrontation is to give the opponent the chance "to test the truth and accuracy of a witness' testimony" and expose "a witness' motivation in testifying." Id. at 76, 632 A.2d at 1110 (quotation omitted)). Preventing criminal defendants from introducing impeachment evidence to

---

[5]    If the record contained a ruling precluding defendant from calling Detective Young to testify that mother told Detective Young that mother had previously accurately described to her counselor the photos she took of A.B. in 2009, the court's ruling would not have been an abuse of discretion for the same reasons the court's ruling excluding testimony by the counselor herself was not an abuse of discretion. See infra, ¶¶ 30-33.

expose a witness's bias would render cross-examination "largely an empty gesture." Id. at 77, 632 A.2d at 1111. Moreover, jurors are " 'entitled to have the benefit of the defense theory before them so that they [can] make an informed judgment as to the weight to place on the witness' testimony.' " Id. at 76, 632 A.2d at 1110 (alterations omitted) (quoting Davis v. Alaska, 415 U.S. 308, 317 (1974)).

¶ 32. In this case, though, the jury heard the core evidence to support defendant's theory that mother sexually abused A.B. when A.B. was an infant; that defendant argued with mother and called her a child molester shortly before mother reported A.B.'s disclosures; and that mother then reported A.B.'s disclosures to the police, along with mother's own actions six years prior, in an effort to preempt any report defendant might make about mother's conduct and shift the attention to him.

¶ 33. Evidence that mother did not fully disclose the contents of the pictures when she spoke to her counselor about them in 2010 would have, at most, impeached mother's credibility by exposing somewhat inconsistent statements on a collateral matter—that is, the scope of her 2010 disclosures to her counselor about the photos she took. A court has broad discretion to exclude extrinsic evidence introduced to impeach a witness on a collateral matter. See V.R.E. 608(b) (providing that extrinsic evidence may not be used to prove instances of witness's conduct for purposes of attacking or supporting witness's credibility, other than conviction of crime as provided in Rule 609); State v. Congress, 2014 VT 129, ¶¶ 46-48, 198 Vt. 241, 114 A.3d 1128 (upholding trial court's refusal to allow extrinsic evidence to impeach witness on collateral matters: whether witness truly needed glasses to read document in court, and whether witness truly lacked education to do so). Mother's actions toward A.B. in 2009 may not be collateral to the issues in this case given defendant's theory that they explain mother's bias and motives to coach a false allegation against defendant. Mother's candor to her counselor five years before the events at issue in this case, on the other hand, lacks "even a tenuous connection to [her] testimony about

13

what she observed in connection with the events at issue in this case." <u>Congress</u>, 2014 VT 129, ¶ 48. The court acted within its discretion in excluding this evidence.

### D. Testimony of DCF Social Worker

¶ 34. Defendant challenges the trial court's ruling precluding him from calling the DCF social worker to testify that (1) mother denied speaking with A.B. about her sexual abuse of A.B. as an infant and (2) the social worker observed that A.B. provided a high level of detail regarding the charges against mother.

¶ 35. As with his challenge concerning testimony from Detective Young that he contends was improperly excluded, defendant does not provide a record citation to a specific proffer of evidence and court ruling excluding the evidence he describes in this challenge on appeal, so our ability to review the argument is limited. See V.R.A.P. 28(a)(4)(A). Instead, defendant's brief cites to a lengthy bench conference among counsel and the court regarding defendant's desire to call mother as a witness in order to elicit <u>mother's</u> testimony that she did not disclose her past 2009 sexual abuse to A.B. The focus of the discussion was whether such questioning would implicate mother's Fifth Amendment rights, and whether mother had waived her right against self-incrimination.

¶ 36. Defendant's express purpose at trial for seeking to elicit the testimony from mother was to impeach A.B. That is, defendant was not trying to undermine mother's credibility by showing that mother denied disclosing the 2009 abuse to A.B. when, in fact, she did. Instead, he sought to show that mother did not disclose the 2009 abuse to A.B., thereby calling into question A.B.'s credibility as a reporter of sexual abuse. In the context of this back-and-forth between the parties and court concerning mother's Fifth Amendment rights, defense counsel raised the possibility of calling a social worker to testify that mother had denied disclosing the 2009 abuse to A.B. The court first suggested that would be hearsay, but then after further discussion concluded that it might not be hearsay if used to impeach mother by showing she had said different things to

14

different people. The court did not make any ruling at all regarding the admissibility of potential testimony by the social worker on this point. In fact, when defense counsel indicated that he might need to lay more foundation from the social worker "who will say that A.B. said these things," the court replied, "Okay. Then fine." Thereafter, the discussion turned back to mother's Fifth Amendment rights and went from there. Nowhere in the discussion cited by defendant in his brief on appeal did the court rule that defendant could not call the DCF social worker to testify that (1) mother denied speaking with A.B. about her sexual abuse of A.B. as an infant and (2) the social worker observed that A.B. provided a high level of detail regarding the charges against mother.

¶ 37. Not only has defendant failed to cite to a specific trial-court ruling excluding the evidence he now argues was wrongly excluded on appeal, but when defendant sought to call the DCF social worker, his proffer as to her expected testimony did not include either of the two items that he now relies upon as the basis for his appeal.[6] Because defendant has not directed us to any actual ruling excluding the testimony he now says was wrongly excluded, and has not pointed us to any proffer in the trial court, we cannot review his claim of error on appeal. See V.R.E. 103(a)(2).[7]

E. Evidence Concerning DCF's 2010 Assessment of Defendant

¶ 38. Twice defendant sought to present evidence that in 2010 DCF viewed defendant as a stable and supportive factor in the family. First, defendant indicated an intent to offer into evidence a DCF report reflecting that in 2010 DCF viewed defendant as the more stable parent in

---

[6] The proffer instead related to DCF's 2010 assessment of defendant, mother, and their family. See infra, ¶¶ 38-39.

[7] We note that if defendant did proffer that the social worker would testify that mother denied telling A.B. about the 2009 sexual abuse, the trial court would have acted within its discretion in excluding the testimony. Given that mother herself testified that she did not tell A.B. about the 2009 abuse, the court could have concluded that testimony from a third party reporting that mother made the same denial to the third party would be cumulative. Pcolar, 2012 VT 58, ¶ 9.

15

the family.[8] The court questioned the relevance of the report, particularly given its remoteness. Second, when defendant sought to call the DCF social worker referenced above, counsel proffered that he expected the social worker to testify that back in 2010 DCF viewed defendant as a stable and supportive factor in the family. The trial court concluded that the evidence was not relevant to any of the issues in the case and was not proper character testimony.

¶ 39. The trial court did not abuse its discretion in excluding evidence regarding DCF's assessment of defendant's role in the family five years prior to the charges in this case—when A.B. was a very young child. The court could reasonably conclude that the proffered evidence did not tend to make the existence of any fact of consequence to determining defendant's guilt any more or less probable. See V.R.E. 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable"); In re Letourneau, 168 Vt. 539, 554, 726 A.2d 31, 41 (1998) ("[T]he trial court has broad discretion to exclude marginally relevant evidence that is remote, tends to confuse the issues or causes a waste of time.").[9]

---

[8] In his brief in chief, defendant asserts that the court did not allow defendant to call the DCF caseworker who wrote this report. In his reply brief, defendant indicated that he did not seek to call that caseworker as a witness but only sought to introduce her report. It is not clear how defendant intended to introduce the caseworker's report if he did not call her as a witness, and defendant has not pointed to any place in the record reflecting that during the trial defendant offered the report into evidence or sought to call its author as a witness. In any event, our analysis does not turn on whether the excluded evidence would have come in through oral testimony or a written report, and does not turn on which witness defendant relied on to introduce the report.

[9] In his brief on appeal, defendant also contends that the trial court precluded him from presenting evidence that mother was deemed a potential danger to A.B. because of her mental-health issues. He does not provide a record citation to any such proffer or ruling, but the claimed evidence appears to be linked to the same 2010 DCF report that described defendant as a positive factor in the family. To the extent that defendant proffered evidence falling into this second category—DCF deemed mother a danger to A.B. because of her mental-health issues—and the court ruled on such proffers, we likewise conclude that the trial court did not abuse its discretion in excluding evidence of DCF's assessment of mother's parenting skills in or around 2010.

F. Discovery and Testimony About Dr. Gilligan's Evaluation of Mother

¶ 40.    Defendant contests the limits the court put on the disclosure to defendant of a psychosexual evaluation of mother conducted in connection with the criminal prosecution of mother for the 2009 act of sexual abuse described above, and on the testimony of its author.

¶ 41.    In connection with criminal charges against mother for her role in the 2009 sexual abuse of A.B., Dr. Claire Gilligan conducted a forensic evaluation of mother, which was provided to the State in connection with mother's separate criminal case.  Defendant requested an order requiring the State to disclose the evaluation to him, and the State objected, filing a copy of the evaluation with the court under seal.  The court ruled that the forensic evaluation was not protected by any patient privilege, but concluded that much of the evaluation contained private and personal information not relevant to defendant's case.  The court disclosed limited portions of the evaluation that it concluded might be relevant to defendant's case.  The court indicated that it would consider further disclosures upon receiving defendant's written motion outlining why further portions of the evaluation might be relevant.

¶ 42.    Before trial, the State filed a motion in limine requesting the exclusion of testimony about mother's mental health.  The State argued that there was no evidence about the state of mother's mental health at the time of A.B.'s disclosure and mother's report, there was no evidence that mother was suffering from any mental-health condition that would affect her ability to perceive and recall events, and mother's mental health had no bearing on the existence of any fact of consequence.

¶ 43.    Defendant opposed the motion and said he wanted to introduce evidence from Dr. Gilligan's report.  Defendant asked the court to revisit its previous ruling releasing only a redacted copy of the report to him, and argued that mother's mental state more broadly was relevant to the dynamic of mother's relationship with him and the allegations in this case.  The trial court expressed doubt, explaining that evidence of mother's conduct may be relevant, but evidence about

17

her mental health and what inferences might be drawn from that is "really, really . . . far afield." The court said, "I'm not saying it could not be relevant. I'm just saying I think you're out at the outer fringes." It added, "I am doubtful about whether we're going to get into mother's mental health history in connection with that. But we'll see." The court indicated that it would review the psychosexual evaluation and reserved judgment on the motion until trial.

¶ 44. Immediately prior to trial, defendant subpoenaed Dr. Gilligan to testify. Dr. Gilligan responded with a request to quash the subpoena on the ground that she did not have ample notice and was not able to reschedule previously scheduled interviews and evaluations without considerable difficulty and consequences.

¶ 45. At the beginning of trial, the court expressed generally that the issue before it was whether or not defendant committed the alleged acts. It indicated that evidence relating to mother's motives or arguments between the parents was fair game, but evidence about mother's "mental health status as such" was not relevant. The court reaffirmed its prior decision giving defendant only partial access to the psychosexual evaluation[10] and generally deferred specific rulings regarding the admissibility of specific testimony until the court heard the testimony.

¶ 46. After the court had taken some testimony, it took up the question of Dr. Gilligan's subpoena. The court was inclined to tell Dr. Gilligan that she need not respond to the subpoena. Defendant emphasized that Dr. Gilligan's testimony was significant because mother told her something that she did not tell anybody else: that she (mother) told the police about her 2009 sexual abuse of A.B. on the night she disclosed A.B.'s report about defendant because mother thought the report about her own sexual abuse of A.B. would sound better coming from her than from defendant. The court did not question the relevance of this testimony, but directed defendant to first cross-examine mother, on the theory that if mother testified to that effect, then testimony on

---

[10] The judge who issued the pretrial discovery ruling was not the judge who presided over the trial.

18

that point from Dr. Gilligan would be cumulative. Accordingly, at the end of the State's case, defendant indicated that Dr. Gilligan might not be needed, depending on mother's testimony.

¶ 47. As mother testified, defendant repeatedly refreshed mother's recollection with a copy of Dr. Gilligan's redacted report. As a consequence, mother ultimately testified herself that she reported her own 2009 sexual abuse of A.B. to the police in connection with her report of A.B.'s allegations concerning defendant because she thought it would be better coming from her than defendant and she was worried about defendant making a report that night about her sexually abusing A.B. At the end of mother's testimony, defense counsel agreed that the court could tell Dr. Gilligan that she did not have to testify, saying, "I think we covered any relevance out of Dr. Gilligan."

¶ 48. Reviewing defendant's challenges, we conclude that the trial court acted within its discretion in limiting defendant's access to the report of Dr. Gilligan's psychosexual evaluation of mother to those portions not redacted by the court. To the extent that the court precluded Dr. Gilligan from testifying about mother's mental health, it acted within its discretion.

¶ 49. When a defendant seeks a witness's mental-health records which are in the State's custody, and the State objects to their disclosure, the defendant is entitled to have the court review the requested documents. The trial court has discretion to determine whether the records "contain information critical to the defendant's ability to impeach the witness" and would "therefore warrant disclosure. If the court concludes that, in its judgment, the records contain no information that should be disclosed, then the material may remain under seal and be made available for inspection on appellate review [by the reviewing court]." State v. Barbera, 2005 VT 13, ¶ 12, 178 Vt. 498, 872 A.2d 309 (mem.) (citations and quotation omitted). The court has discretion to decide which, if any, portions of the records should be disclosed, State v. Rehkop, 2006 VT 72, ¶ 26 n.2, 180 Vt. 228, 908 A.2d 488, but this "discretion is not unbounded." Pennsylvania v. Ritchie, 480

19

U.S. 39, 60 (1987).  The court is "obligated to release information material to the fairness of the trial."  Id.

¶ 50.  After reviewing the sealed psychosexual evaluation with these considerations in mind, we conclude that the trial court's discovery order was within its discretion.  The disclosed portion of the report includes all of the report's discussion concerning the circumstances surrounding A.B.'s disclosure, including a description of mother's fight with defendant that evening, mother's fears that he would use the 2009 incident to take A.B. away from her, and the manner in which A.B. made the disclosure.  It includes a description of the 2009 incident and mother's 2010 reports to the program in which she was enrolled and to DCF in connection with their questioning about the photos.  It also includes discussion of mother's alleged disclosure about the 2009 incident to A.B. during a supervised visit following her report to the police about defendant, and mother's claim to A.B. that defendant made her do it; and reports from A.B.'s foster mother regarding A.B.'s disclosures to the foster mother concerning abusive acts by defendant and A.B.'s reflection that her mother had done a "bad thing" to her.  These are the essential pieces relating to defendant's theory of the case.  By contrast, the redacted content that was not produced to defendant includes a detailed psychosocial history of mother, psychological testing, and the evaluator's summary of other documents that are directly available to defendant (such as Detective Young's affidavit concerning her initial interview with mother).  Given the legal framework set forth above, these redactions were well within the trial court's discretion.

¶ 51.  With respect to defendant's challenge to the exclusion of evidence, we find no clear ruling actually limiting Dr. Gilligan's testimony except a broad discussion by the court of the relevance of mother's mental health in general, as contrasted with her conduct.  The court's ruling on this subject was in response to a general motion in limine filed by the State, and did not purport to address a specific proffer by defendant.  The court deferred its actual rulings as to admissibility of evidence until it had heard the relevant testimony.  Defendant never proffered testimony from

20

Dr. Gilligan concerning some specific aspect of mother's mental health, so it is difficult to review defendant's claim that the court precluded him from presenting testimony from Dr. Gilligan about mother's mental health.

¶ 52. To the extent that defendant construed the trial court's general discussion of the relevance of mother's mental health as such as a ruling, and refrained from seeking Dr. Gilligan's testimony concerning mother's mental health on that basis, the trial court acted within its discretion. The court left open a wide range of evidence concerning mother's conduct, including conduct that reflected on or stemmed from mental-health issues. Defendant did not make a specific proffer of evidence relating to mother's mental health as such that was relevant to mother's capacity to tell the truth, predisposition to coaching A.B. to make false accusations, or other matters at issue in this case. Based on defendant's own proffer, Dr. Gilligan's testimony concerning mother's mental health related to mother's mental health in 2009, at the time mother engaged in the sexually abusive conduct. The court could reasonably conclude that mother's mental state in 2009, six years before the disclosure by A.B. and report by mother that set this case in motion, was too remote in time to be relevant to this case, and would unduly confuse the issues. See Letourneau, 168 Vt. at 554, 726 A.2d at 41.

¶ 53. Although we have relied primarily on the Vermont Rules of Evidence in the above analysis of defendant's various evidentiary challenges on appeal, we emphasize that our reasoning in each case applies to defendant's constitutional due process claims as well. The U.S. Supreme Court has recognized that the exclusion of critical evidence denies a defendant a fair trial in accord with the mandates of due process. Chambers v. Mississippi, 410 U.S. 284 (1973). Chambers held that prohibiting a defendant from cross-examining a witness who had previously confessed to the murder the defendant was charged with, and prohibiting the defendant from offering the testimony of three people who had heard the witness confess to the murder, prevented him from introducing evidence "critical to [his] defense" and deprived him of due process. Id. at 302-303. Unlike in

21

Chambers, defendant was not precluded from introducing any critical evidence. Where a trial court acts within its discretion to exclude evidence, there is no due process violation. See State v. Lamb, 142 Vt. 87, 89, 453 A.2d 78, 79 (1982) (holding that where defendant did not explain how evidence was admissible, argument that its exclusion violated his right to due process was meritless). The trial court here acted within its discretion, and there is no due process violation.[11]

### III.   Ruling Allowing A.B. to Testify out of Defendant's Presence Under Rule 807(f)

¶ 54.    Defendant raises four distinct objections to the trial court's order allowing A.B. to testify outside of his presence and the implementation of that order. The generally relevant background is as follows. Before trial, the State filed a motion pursuant to Vermont Rule of Evidence 807 to permit A.B. to provide her trial testimony by two-way closed-circuit television or videotape outside of the courtroom.

¶ 55.    Following a hearing, the court granted the motion. Relying on the testimony of A.B.'s therapist of many months, the court found that A.B. had been diagnosed with post-traumatic stress disorder. The bases for the diagnosis included A.B.'s flashbacks and intrusive thoughts about the alleged abuse, difficulty sleeping, irritability without provocation, frequent outbursts of crying, and anger and frustration—symptoms that persisted at the time of the hearing. The court found that A.B. has a strong reaction to discussion of the events underlying these criminal charges and has difficulty talking about the allegations even with her own therapist.[12] A.B.'s reaction to discussing these events has included "curling up in a ball, shutting down and not talking." The court credited the therapist's opinion that requiring A.B. to testify in a courtroom setting "creates

---

[11] Likewise, defendant does not make out a claim under the Vermont Constitution. State v. Brillon, 2010 VT 25, ¶ 6, 187 Vt. 444, 995 A.2d 557. "Merely citing the Vermont Constitution, without providing any analysis of how the state constitutional provision compares with its federal analog, does not adequately present the issue for our review, especially where the argument was not presented in the trial court." Id.

[12] The court noted that there was a brief period during which A.B. spoke excessively freely and openly about the events, but that that period had passed.

a substantial risk of trauma to A.B. which would substantially impair her ability to testify" and a substantial risk that she would be unable to respond to questions.

¶ 56. In addition, in light of A.B.'s high degree of trauma caused by defendant's alleged actions, together with her fear and anger toward defendant and the significant period of time not seeing him, the court also concluded that requiring A.B. to hear and see defendant "would present a substantial risk of trauma to A.B. and would substantially impair her ability to testify." The court credited the therapist's testimony and found that "it is highly likely that A.B. would completely shut down and respond in a very strong emotional manner." The court accordingly ordered that defendant be situated in a manner that A.B. could not see or hear him during her testimony.

¶ 57. On appeal, defendant argues that Rule 807(f), the provision that allows for child testimony outside of the sight and hearing of a defendant in limited circumstances, is facially unconstitutional. He further argues that the trial court abused its discretion in granting the motion, both because the court should not have allowed A.B.'s therapist to testify and because defendant was wrongly precluded from visitation with A.B., which led to the estrangement that supported the trial court's assessment. Finally, he argues that the way the order was implemented prevented him from having contemporaneous contact with his counsel during counsel's questioning of A.B. We will consider each of these challenges in turn.

A. Constitutionality of Rule 807(f)

¶ 58. Defendant argues that Rule 807(f) is facially unconstitutional because it allows infringement upon the right to confrontation without the constitutionally required showing of necessity. In particular, he emphasizes that Rule 807(f) allows a child witness in a sexual-assault case to testify without hearing or seeing the defendant if hearing or seeing the defendant would pose "a substantial risk of trauma to the child . . . which would substantially impair the ability of the child . . . to testify." Defendant argues that standard allows for an exception to a defendant's

confrontation rights without a showing that seeing or hearing the defendant would cause the child significant trauma, as required by Maryland v. Craig, 497 U.S. 836 (1990).

¶ 59. The State counters that the required finding that a child faces a "substantial risk of trauma" is essentially the same as a finding that the child is likely to suffer trauma, and argues that Craig does not require a finding of significant trauma—it simply requires that the trauma be more than minimal.

¶ 60. Because defendant failed to raise this claim before the trial court, we review it for plain error. V.R.Cr.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); State v. Oscarson, 2004 VT 4, ¶ 27, 176 Vt. 176, 845 A.2d 337 (explaining that plain error is limited to "exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights" (quotation omitted)).

¶ 61. In evaluating Rule 807(f), "we employ tools similar to those we use in statutory construction. That is to say that when construing a rule, we consider its plain language and the purpose it was designed to serve." State v. Amidon, 2008 VT 122, ¶ 16, 185 Vt. 1, 967 A.2d 1126. Because this court rule was adopted pursuant to an act of the Legislature, we must be mindful of the Legislature's intent. Vt. Const. ch. II, § 37 (providing that "[a]ny rule adopted by the Supreme Court may be revised by the General Assembly"); 1985, No. 82, § 1 (revising Article VIII of the Vermont Rules of Evidence by adopting Rule 807); Deutsche Bank v. Pinette, 2016 VT 71, ¶ 17, 202 Vt. 328, 149 A.3d 479 ("When interpreting a statute or rule, our overriding goal is to effectuate the drafter's intent . . . ."). We presume statutes passed by the Legislature are constitutional, and when possible construe them to avoid constitutional infirmity; we will afford rules implemented by the Legislature the same presumption of constitutionality. See In re M.C., 2018 VT 139, ¶ 9, __ Vt. __, __ A.3d __ (noting that this Court will "construe statutes to avoid constitutional

difficulties, if possible" (quotation omitted)); State v. Noll, 2018 VT 106, ¶ 21, __ Vt. __, 199 A.3d 1054 ("We afford statutes a presumption of constitutionality.").

¶ 62. Exceptions to the Sixth Amendment right to confrontation are few and narrow. The exception for a child witness in a prosecution for sexual assault on that child applies only upon a showing that testifying in the defendant's presence would cause emotional trauma that is not mere nervousness or excitement or reluctance to testify but, rather, would impair the child's ability to communicate. Rule 807 does purport to allow for an exception to the right of confrontation upon a lesser showing, in violation of the Sixth Amendment. However, because the trial court in this case made a finding satisfying the more rigorous constitutional standard, we conclude that defendant has not shown plain error.

¶ 63. The Confrontation Clause, which applies to the states through the Fourteenth Amendment, provides that in "criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has long understood face-to-face confrontation with adverse witnesses to be central to the integrity of a criminal trial, in part because of the long-standing belief that it is harder to lie about someone to their face than behind their back. Coy v. Iowa, 487 U.S. 1012, 1019 (1988).

¶ 64. The Confrontation Clause does not, however, provide "defendants the absolute right to a face-to-face meeting with witnesses against them at trial"; it rather "reflects a preference for face-to-face confrontation at trial." Craig, 497 U.S. at 844, 849. This is, however, a strong preference, and a "defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured."[13] Id. at 850 (emphasis added).

---

[13] To the extent that defendant raised a claim for the first time at oral argument that A.B.'s testimony was insufficiently reliable because A.B. did not know she was testifying in a legal

25

¶ 65.    The Supreme Court has held that a state's "interest in protecting child witnesses from the trauma of testifying in a child abuse case" is a sufficiently important public policy to justify an incursion on the right to face-to-face confrontation, "[g]iven the State's traditional and transcendent interest in protecting the welfare of children, and buttressed by the growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court."  Id. at 850, 855 (quotation omitted).  However, the State must make "an adequate showing of necessity" in each individual case to justify allowing a child to testify outside the defendant's presence; otherwise such testimony would violate the Confrontation Clause.  Id. at 855.

¶ 66.    To make this showing of necessity, the State must show that the "witness would be traumatized, not by the courtroom generally, but by the presence of the defendant."  Id. at 856.  It must also show that the witness would suffer a level of emotional trauma that "is more than . . . mere nervousness or excitement or some reluctance to testify" and "would impair the child's ability to communicate."  Id. at 856-57 (quotation omitted).  The U.S. Supreme Court has not decided the minimum level of trauma required, but did hold that a state statute requiring "that the child witness will suffer 'serious emotional distress such that the child cannot reasonably communicate,' clearly suffices to meet constitutional standards."  Id. at 856 (citing Md. Code Ann., Crim. Proc. § 11-303(b)(1)).[14]

¶ 67.    Rule 807(f) on its face does not require a showing that meets this constitutional standard.  It purports to allow a child witness to testify outside of a defendant's presence upon a showing of "a substantial risk of trauma to the child" that would "substantially impair the ability

_____

proceeding, we do not consider it.  We will not consider issues, even those of a constitutional nature, that are insufficiently raised and inadequately briefed.  Brillon, 2010 VT 25, ¶ 6.

[14]  At the time Craig was decided, the statute was at Md. Cts. & Jud. Proc. Code Ann. § 9–102(a)(1)(ii).

of the child . . . to testify." (Emphasis added.) Craig held that the "trial court must find that the child witness would be traumatized" by the defendant's presence and that "the trauma would impair the child's ability to communicate." 497 U.S. at 856-57 (emphases added). We understand the requirement that the court find that the child "would be" traumatized to require proof of not only a "risk" of trauma, or a "substantial risk" of trauma, but that it is more likely than not—in other words, that there is a preponderance of the evidence—that the child will be traumatized. See In re Watford, 809 S.E.2d 651, 656 (Va. 2018) (holding "use of the word 'would' focuses the inquiry . . . on the likely" outcome (quotation omitted)). Rule 807(f) does not appear to require a preponderance of the evidence; it requires a finding that testifying face-to-face to the defendant pose "a substantial risk of trauma to the child . . . which would substantially impair the ability of the child . . . to testify." (Emphasis added.) Requiring a finding of "substantial risk" suggests a standard more analogous to probable cause or reasonable suspicion than a "preponderance."[15] See

_____

[15] At least one court has concluded that the U.S. Constitution, as construed in Craig, requires proof by a more onerous "clear and convincing" standard. See State ex rel. Montgomery v. Padilla, 371 P.3d 642, 645-46 (Ariz. Ct. App. 2016) ("Given the constitutional significance of limiting a defendant's right to confront witnesses face-to-face and a . . . defendant's right to personally cross-examine those witnesses, . . . the heightened standard of clear and convincing evidence must apply."); see also Commonwealth v. Bergstrom, 524 N.E.2d 366, 376 (Mass. 1988) (holding that under the Massachusetts Constitution, "in the absence of a waiver, the Commonwealth must show, by more than a mere preponderance of evidence, a compelling need for use of such a procedure. Such a compelling need could be shown where, by proof beyond a reasonable doubt, the recording of the testimony of a child witness outside the courtroom (but in the presence of the defendant) is shown to be necessary so as to avoid severe and long lasting emotional trauma to the child.").

Other courts have explicitly or implicitly endorsed a preponderance standard. See, e.g., Brady v. State, 575 N.E.2d 981, 984-86 (Ind. 1991) (holding Indiana statute that allowed child to testify outside of court upon finding it was more likely than not that trauma would result from testifying in defendant's presence met requirements of Craig); Taylor v. Wall, 821 A.2d 685, 690 (R.I. 2003) (holding that court's finding that child "would suffer unreasonable and unnecessary mental and emotional harm if required to testify in defendant's presence" satisfied Craig requirements).

Some states expressly include a preponderance standard in their statutes. See Ga. Code Ann. § 17-8-55(d); Mass. Gen. Laws Ann. ch. 278, § 16D(b)(1). Other states require that the prosecution prove that testifying in the defendant's presence would traumatize the child by clear

27

State v. Perley, 2015 VT 102, ¶ 19, 200 Vt. 84, 129 A.3d 93 (explaining that "probable cause" is a lower standard than "preponderance" of the evidence); State v. Simoneau, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280 (explaining that reasonable suspicion to support a traffic stop must be "more than an unparticularized suspicion or hunch of criminal activity, but needs considerably less than proof of wrongdoing by a preponderance of the evidence").

¶ 68. The requirements of Rule 807(f) are clearly less stringent than Craig's requirement of a finding that the child would be traumatized, and that the trauma would impair the child's ability to communicate. Craig, 497 U.S. at 856-57.[16] For that reason, we agree with the

and convincing evidence. See Ark. Code Ann. § 16-43-1001(a)(1); Cal. Penal Code § 1347(b)(2); Conn. Gen. Stat. § 54-86g(a); Idaho Code Ann. § 9-180(5)(1); Kan. Sess. Laws 22-3434(b); Mont. Code Ann. § 46-16-229(1); Nev. Rev. Stat. Ann. § 50.580(1)(a); N.Y. Crim. Proc. Law §§ 65.10(1), 65.20(2); Okla. Stat. Ann. tit. 12, § 2611.7(A); W. Va. Code Ann. § 62-6B-3(b).

We conclude that, although the Legislature is free to amend the rule to require proof by clear and convincing evidence that testifying in a defendant's presence will traumatize a child witness, the U.S. Supreme Court's decision in Craig does not require such a heightened standard. We reach this conclusion for two reasons. First, had the Court intended to require a standard other than a preponderance, it would have so specified. Cf. Jones v. Jones, 905 N.W.2d 475, 480 n.4 (Mich. Ct. App. 2017) (noting that when statute does not provide evidentiary burden, "default preponderance of the evidence standard" applies). Second, the Maryland statute the Court upheld in Craig did not require proof of trauma to the child by clear and convincing evidence. See Craig, 497 U.S. at 840 n.1 (quoting Maryland statute that allowed testimony by closed-circuit television if "[t]he judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate"). Accordingly, we conclude that the minimum standard required by the U.S. Constitution is proof by a preponderance of the evidence. But see Knauff v. Hooks, No. 1:15-CV-338, 2016 WL 2587965, at *7 (S.D. Ohio May 4, 2016) (upholding statute allowing a child victim to testify outside the defendant's presence if there is a "substantial likelihood that the child victim will suffer serious emotional trauma" from testifying in the defendant's presence); State v. Foster, 957 P.2d 712, 727 (Wash. 1998) (en banc) (upholding statute allowing child witness to testify outside defendant's presence upon finding of " 'substantial evidence that requiring the child to testify in the presence of the defendant will cause the child to suffer serious emotional or mental distress that will prevent the child from reasonably communicating' " (quoting Wash. Rev. Code § 9A.44.150(1)(c)). We do not address the requirements of the Vermont Constitution on this point.

[16] We note that the standard reflected in Rule 807(f) dates back to the Legislature's 1985, pre-Craig enactment. 1985, No. 82, § 1. Although the Legislature subsequently amended the rule post-Craig, the primary purpose of that amendment was to expand the class of victim witnesses subject to the rule. 1993, No. 100, § 12. We presume that the Legislature intends for this rule to be applied in conformity with the U.S. Constitution, Vt. Educ. Bldgs. Fin. Agency v. Mann, 127

28

defendant's argument that Rule 807(f) on its face could unconstitutionally allow for an exception to a defendant's confrontation rights without a sufficient showing. See United States v. Bordeaux, 400 F.3d 548, 553 (8th Cir. 2005) (noting that 18 U.S.C. § 3509, allowing child witness to testify by two-way closed-circuit television upon finding child unable to testify in open court due to fear, is "unconstitutional to the extent that it requires a different showing of fear from what Craig requires").

¶ 69. However, we do not reverse on that basis because notwithstanding the lower standard reflected in Rule 807(f), the trial court made a constitutionally sufficient finding to support its ruling under Rule 807(f). In particular, after making findings about the trauma A.B. experienced in connection with the events giving rise to this prosecution, and her reaction to attempts to discuss the topic, the court found that it was "highly likely that A.B. would completely shut down and respond in a very strong emotional manner."[17] Although this finding doesn't match the approved language in Craig word for word, we conclude that the court found a high likelihood—not just a substantial risk—that A.B. would be traumatized and that the trauma would impair her ability to testify. Accordingly, we cannot conclude that the constitutional infirmity in Rule 807(f) seriously affected defendant's substantial rights. Oscarson, 2004 VT 4, ¶ 27 ("To reverse on plain error, we must find not only that the error seriously affected substantial rights, but also that it had an unfair prejudicial impact on the jury's deliberations.").

---

Vt. 262, 271, 247 A.2d 68, 74 (1968), and refer the matter to the Advisory Committee on the Rules of Evidence to propose amendments to conform the rule to the requirements of the U.S. Constitution.

[17] We recognize that the court made other findings to the less rigorous "substantial risk" standard called for in Rule 807(f), but conclude that in light of the court's other specific factual findings, the "highly likely" finding encompasses all the essential elements required by Craig.

B.  Reliance on Testimony of Child's Therapist

¶ 70.    Defendant's second challenge to the court's ruling under Rule 807(f) is that the court improperly relied on testimony from A.B.'s therapist in making the necessary findings.  He contends that the provider-patient relationship between the therapist and A.B. renders the therapist biased given the therapeutic alliance between provider and patient.  He points to the prohibition in Rule 5 of the Vermont Rules of Family Procedure against appointing an expert who presently or formerly provided treatment to the person being evaluated, and professional ethical requirements prohibiting counselors from providing forensic evaluation services concerning current or past clients.  He concedes he did not object to the therapist's testimony before the trial court.

¶ 71.    Because defendant did not raise this argument before the trial court, we review the court's admission of this testimony for plain error.  V.R.Cr.P. 52(b); Oscarson, 2004 VT 4, ¶ 27.

¶ 72.    Defendant's argument fails to recognize the distinction between a forensic evaluator and a treating provider.  The child's therapist in this case was not retained by the court to conduct an impartial assessment.  She did not hold herself out to the court as a forensic evaluator.  She testified as A.B.'s treating clinician, and her testimony was expressly informed by that therapeutic relationship.

¶ 73.    A treating provider who satisfies the requirements of Vermont Rule of Evidence 702 may be a competent expert witness.  That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

V.R.E. 702.  Although he questions the propriety of the therapist testifying given her therapeutic relationship with A.B., defendant does not (and did not) contest her actual qualifications to testify

30

about the matters at issue, and does not contend that the testimony is not based upon sufficient facts or methodology.

¶ 74. This is not to say that testimony in court from a treating provider is not potentially fraught. Commentators have emphasized the distinction between the duties of a therapist versus a forensic or neutral evaluator, and have highlighted the issues that may arise when an individual's treating therapist testifies as an expert in court. See, e.g., 1 Demothenes Lorandos & Terence Campbell, Cross Examining Experts in the Behavioral Sciences § 2.3 (Nov. 2018 update) (contrasting treating provider's focus on therapeutic alliance with patient with expert witness's obligation to testify objectively and candidly); Kirk Heilbrun, Child Custody Evaluation: Critically Assessing Mental Health Experts and Psychological Tests, 29 Fam. L. Q. 63, 69-71 (1995) (identifying problems that arise when treating mental-health provider testifies in litigation).

¶ 75. But these issues are not disqualifying if a treating provider otherwise has sufficient training and bases for opinions to meet the requirements of Rule 702. This Court has routinely upheld trial courts' reliance on expert testimony by a treating provider. See, e.g., State v. J.S., 174 Vt. 619, 621, 817 A.2d 53, 56 (2002) (mem.) (relying on testimony of appellant's treating psychiatrist to support trial court's determination); In re K.M., 165 Vt. 569, 570, 678 A.2d 1263, 1264 (1996) (mem.) (relying in part on testimony of involuntarily hospitalized appellant's treating physician concerning appellant's competence).

¶ 76. A proper response to the tensions between a treating provider's roles as treater and testifying expert is cross examination or impeaching evidence highlighting potential issues with the treating provider's testimony. See, e.g., 1 Lorandos & Campbell, supra, § 2:21 (laying out model cross examination of treating provider); Mary Stumo, Holly M. Robbins & Julie M. Giddings, Litigating the Sexual Harassment Case § 20.III (1st ed. 2010) (noting that treating psychiatrists or psychologists may be vulnerable to attack by the defense).

¶ 77. While the therapist's relationship with A.B. would have been a fair basis for cross examination, defendant has identified no law suggesting that simply because she was A.B.'s treating provider she could not provide expert testimony based on her training and her experience treating A.B. Cf. State v. Dunbar, 152 Vt. 399, 410-11, 566 A.2d 970, 976-77 (1989) (holding fact that clinician who testified only about general principles concerning child victims of sexual assault was child victim's treating provider did not, by itself, suggest bias).[18] Given these considerations, we conclude that the court's admission of the therapist's testimony was not plain error.

### C. Limits on Defendant's Contact with A.B.

¶ 78. Defendant next argues that he was denied substantive due process because he did not have pretrial visits with A.B., even though mother had supervised visitation with her, and that fact led to the court's decision to allow A.B. to testify by prerecorded video pursuant to Rule 807(f). Defendant did not raise these claims below, so we review them for plain error. V.R.Cr.P. 52(b); Oscarson, 2004 VT 4, ¶ 27.

¶ 79. In reviewing defendant's argument, it is difficult to discern which ruling, of which court, defendant asks us to review. Defendant does not directly challenge the trial court's order pursuant to Rule 807 that relies in part on the lengthy period of estrangement between defendant and A.B. in authorizing A.B.'s testimony outside of defendant's presence. Nor does he appear to challenge any order of the trial court relating to defendant's contact with A.B. In short, defendant presents us no actual order in this case to review.[19]

---

[18] Defendant's reliance on Vermont Rule of Family Procedure 5 is misplaced. Not only is that rule inapplicable to proceedings in the criminal division, but the rule, on its face, precludes a current or former treating provider from conducting an evaluation for the court only when the subject of the evaluation does not consent. V.R.F.P. 5(b).

[19] Nor do we find an order in this docket prohibiting contact between defendant and A.B.

¶ 80. Instead, he asks us to take "judicial notice" of "discussions regarding visitation" in a proceeding in the Family Division. Apparently, he is not actually challenging a court order in the Family Division, but contends that "discussions" in that court support his claim. His reasoning is that DCF generally opposed visitation unless defendant met a number of conditions, and that the State is therefore accountable for the lack of contact between him and A.B., and for the subsequent impact of that estrangement on his right to be visible to her while she testified in the criminal proceeding.

¶ 81. Defendant has not raised a cognizable argument on appeal. To the extent that defendant took issue with DCF recommendations to the court in the Family Division, he was free to present contrary evidence in that setting. To the extent that he objected to a ruling of the Family Division regarding contact or visitation, he was free to appeal that ruling. To the extent he objected to the impact of a ruling of the Family Division on the proceedings in this criminal case, he could have sought an order from the trial court mitigating that impact. He did none of these things. Because defendant has not presented any legal challenges to any orders of the Superior Court, Criminal Division, in this proceeding, he has not given us anything to review. See V.R.A.P. 28(a)(4) (explaining requirements for adequate briefing); King v. Gorczky, 2003 VT 34, ¶ 21 n.5, 175 Vt. 220, 825 A.2d 16 (declining to address constitutional challenges because briefing was inadequate). We cannot, on that basis, find plain error.[20]

### D. Communication with Attorney During 807(f) Testimony

¶ 82. Defendant contends that because he was unable to communicate with his attorney during A.B.'s videotaped testimony, the proceeding violated his Sixth Amendment rights to

---

[20] After oral argument, defendant moved for this Court to take judicial notice of "the discussions regarding visitation" in a transcript of a disposition hearing in A.B.'s Family Division proceeding. Because the proper forum for appealing a court order in the Family Division is an appeal of that order from the Family Division, not an appeal of a criminal conviction of one of the parties to the Family Division proceeding, we deny defendant's motion.

counsel and to confrontation. Defendant represents that he sat in a separate room and heard the audio of A.B.'s Rule 807 testimony by cell phone. He further represents that his cell phone was placed on mute so that he could not be heard. He contends that the arrangement deprived him of contemporaneous communication with his attorney, who was present in the room with A.B.

¶ 83. Defendant did not make any claim at the trial-court level about his inability to contemporaneously communicate with his attorney during A.B.'s testimony, let alone that it deprived him of constitutional rights. In fact, the video of the testimony shows that defendant's counsel was actively involved in the set-up for the testimony, in the presence of a judge.

¶ 84. We need not decide whether defendant has waived his objection,[21] because even assuming plain-error review applies, defendant has not shown plain error. V.R.Cr.P. 52(b); Oscarson, 2004 VT 4, ¶ 27. The only evidence defendant offers of prejudice is that at one point, the cell phone stopped working. At that moment, the State's attorney asked A.B. about an "incident with high heels." Defendant claims on appeal that he did not hear A.B.'s reply that "I do not want to remember the high heel thing," and that had he heard it, "he could have asked his counsel to followup." He offers no indication that he had particular information about this testimony to inform counsel's follow-up or that counsel would have in fact followed up on his suggestion, and he does not explain what kind of follow-up to this question would have been helpful. His argument is too speculative to support plain error.

---

[21] See State v. Tribble, 2012 VT 105, ¶ 35, 193 Vt. 194, 67 A.3d 210 ("Fundamental constitutional rights, including the right to confrontation, can undoubtedly be waived."); State v. Koveos, 169 Vt. 62, 67-68, 732 A.2d 722, 726 (1999) (defendant could not argue he was denied right to confront witness when he agreed to procedure that allowed admission of pretrial deposition without live testimony of witness). But see State v. Grace, 2016 VT 113, ¶¶ 15-19, 204 Vt. 68, 165 A.3d 122 (holding, where "there [wa]s nothing to indicate that counsel consulted with defendant on this point and explained his rights and what he would be sacrificing by not appearing, or that defendant in response knowingly and voluntarily waived the right," defendant had not knowingly waived right to confrontation, and applying plain-error review).

## IV.  A.B.'s Counseling Records

¶ 85.    Defendant argues that A.B.'s counseling records should have been discoverable because, when the State requested that A.B. be allowed to testify pursuant to Rule 807, her mental health became an element of a claim or defense under Vermont Rule of Evidence 503(d)(3), and thus the records were no longer privileged.  However, he has not identified any order by the trial court which he claims was erroneous.

¶ 86.    At the hearing on the State's motion to allow A.B. to testify pursuant to Rule 807, the State subpoenaed A.B.'s therapist to testify as to the trauma that testifying in defendant's presence would cause A.B.  Counsel for the Howard Center, where the therapist was employed, informed the court that the Howard Center had "obtained a very narrow release from DCF," which it represented was A.B.'s legal custodian at the time, to discuss only those portions of her mental-health records that "related to the substance" of the inquiry under Rule 807.  The Howard Center said it intended to object to any questioning about A.B.'s mental-health records that went outside the scope of the release and that could be understood to waive A.B.'s patient privilege more broadly.  Defendant objected, arguing that A.B.'s entire counseling record should "be open" because all of the therapist's contacts with A.B. informed the determination of the likelihood of trauma to A.B.  The court responded, "I think we can navigate it.  If not—if I'm at a point where I don't feel comfortable issuing certain rulings to objections or offers, then I will recess, and we'll take a look at some law.  But let's attempt to proceed."  Defendant does not point to any indication in the record that he subsequently made an objection or sought release of additional records in light of testimony elicited, and he does not cite any subsequent court rulings on the matter.

¶ 87.    In the absence of an actual ruling by the trial court, we have nothing to review.  This case is akin to State v. Hooper, 151 Vt. 42, 557 A.2d 880 (1988).  In that case, the defendant argued he should have been allowed to introduce evidence of a Federal Bureau of Investigation analysis

of the hair found on the victim.  We concluded that the claim was not properly before us.  We explained:

> Defendant's evidence about the analysis of the hair samples was not covered by the motion in limine and, therefore, was not excluded by the grant of that motion.  Defendant made no attempt to raise his theory about the hair samples during his trial.  Even though, at the motion hearing, the trial court expressed its doubt that the evidence regarding the hair samples would be admissible, it did not rule that it was inadmissible. . . .  Since defendant never availed himself of the opportunity to present evidence to prove his argument during trial, this Court has nothing before it to review.

Id. at 45-46, 557 A.2d at 882.  Because defendant did not make specific requests for appropriate discovery based on the testimony as it came out in the proceeding, the court never got the chance to actually rule on the matter in the context of specific evidence, and defendant has nothing to appeal.[22]

## V.  Expert Testimony and Vouching

¶ 88.    Finally, defendant argues that the trial court abused its discretion in allowing testimony by the State's experts, Dr. William Halikias and Dr. Joseph Hagan, that impermissibly vouched for A.B.'s credibility.  Defendant did not raise these claims at the trial level, so we review for plain error.

¶ 89.    At trial, the State offered expert testimony by Dr. Halikias concerning current research on children's resistance to coercive questioning.  The State offered Dr. Halikias's testimony in rebuttal to expert testimony put on by the defense concerning research showing that repeated questioning, leading questions, and nonverbal cues can reduce the reliability of children's testimony and even alter their memories of events.  When asked about research about children's ability to resist coercive questioning, Dr. Halikias noted that some studies have found that

---

[22]   Defendant explains his failure to follow up on this issue by stating that any request for the records after the hearing would not have been helpful.  He fails to acknowledge that he had the opportunity during the hearing to point to specific testimony and argue that it opened the door to further discovery before the conclusion of the hearing.

"remarkably few [children] affirm" a false, leading question. He testified about a study of preschoolers subjected to repeated interviews in which adults asked "coercive questions, such as he took your clothes off, didn't he? We know that happened. We spoke to your mother. Your mother told us about it. The older children told us about it. Now you tell us about it." He noted that "in that particular research study, ninety-one percent of the children resisted even that coercive line of questioning." Summing up the research in this field, he said "it's never all" children who resist coercive questioning. He concluded that "it's certainly possible" to induce a child to falsely say an adult took off their clothes, "but it's difficult, and it becomes more difficult" to induce a child to falsely recount "genital touch because young children don't know what sex is." He said it is particularly hard to lead a child to falsely acknowledge or develop a false memory of genital touch by someone the child is close to. He then went on to describe a study wherein researchers induced college students to falsely believe they had committed a felony when they were fifteen by repeatedly interviewing them and giving them false information. He concluded, "it's possible" to induce a false memory "even with adults. But it takes a lot of work, and it takes effort."

¶ 90.   The State also introduced expert testimony by Dr. Hagan as to the results of the sexual-assault examination he performed on A.B. after her forensic interview. Dr. Hagan testified that the examination findings were normal. He also testified that while he sometimes takes a patient history, he did not take one for A.B. because sexual abuse is traumatic, and A.B. had just been through a forensic interview in which she "made significant disclosures" that were "very clear and graphic." After reviewing those disclosures, Dr. Hagan and the nurse with whom he was working decided that eliciting further history from A.B. was unnecessary, particularly because of the concern that it would further traumatize her.

¶ 91.   On appeal, defendant argues that Dr. Halikias vouched for A.B.'s credibility when he testified that fewer than nine percent of children in a study were induced to falsely identify genital touch. He also contends Dr. Hagan implied that A.B. had been sexually abused, thereby

37

vouching for her allegations against defendant, when he described her disclosures as significant, clear, and graphic.

¶ 92.   Because defendant did not timely raise either of these claims at the trial level, we review for plain error.   V.R.Cr.P. 52(b).   To preserve a claim that evidence was improperly admitted, a party must make "a timely objection or motion to strike."  V.R.E. 103(a)(1).   "This means that the objection must have been made at the time the evidence was offered or the question was asked." State v. Kinney, 171 Vt. 239, 253, 762 A.2d 833, 844 (2000) (alteration and quotation omitted).   Defendant did not make such a timely objection as to either expert's testimony.

¶ 93.   We conclude that neither Dr. Halikias's nor Dr. Hagan's testimony improperly vouched for A.B.'s credibility, as neither directly commented on A.B.'s credibility.

¶ 94.   Experts may not offer testimony that vouches, even implicitly, for another witness's credibility.  See State v. Catsam, 148 Vt. 366, 370, 534 A.2d 184, 187-88 (1987).  In Catsam, we held that expert testimony that a child complainant in a sexual-abuse case had post-traumatic stress disorder, or PTSD, and that people diagnosed with PTSD generally do not fabricate claims of sexual abuse, was "the equivalent of a direct comment on the credibility of the testifying complainant" and was thus inadmissible.  Id.  Similarly, in State v. Kinney, a case in which the defendant was charged with aggravated sexual assault, an expert for the State testified that the incidence of false reporting in rape cases was less than two percent.   We held this to be inadmissible because the jury could infer from the testimony that allegations of rape are almost always true, and thus that the complainant's allegation was almost certainly true.  171 Vt. at 253, 762 A.2d at 844. We affirmed the conviction, though, because admission of the improper testimony did not rise to the level of plain error.  Id. at 253, 762 A.2d at 845.

¶ 95.   We likewise conclude that Dr. Halikias's testimony does not rise to the level of plain error.  This is a close case: the jury could infer from the testimony that because only a small percentage of children were induced to make false allegations, it was unlikely A.B. had been

38

coerced into falsely accusing defendant, and therefore she was likely telling the truth. We need not decide whether, upon a proper objection, the testimony should have been stricken; we conclude that any error does not rise to the level of plain error. See id. (finding no plain error because we "cannot conclude that failure to exclude the inadmissible expert testimony caused a miscarriage of justice in this case"). Several aspects of Dr. Halikias's testimony in combination support our conclusion that any error does not rise to the level of plain error. First, Dr. Halikias did not purport to give a global statistic; he emphasized that the statistic he related arose from a particular study. Second, his testimony as a whole emphasized how difficult it is to coerce children to falsely report, but also acknowledged that it can be done. Third, the testimony was a logical response to the testimony of defendant's expert who described research suggesting that children can be coerced to make false allegations. And finally, the focus of Dr. Halikias's testimony was not on the general truthfulness of children's reports of sexual abuse but, rather, was on the susceptibility (or not) of children to coercion or suggestion inducing false allegations.[23]

¶ 96. We conclude that admission of Dr. Hagan's testimony was not error at all, let alone plain error. We have held in the past that a physician's testimony that a child sexual-abuse

---

[23] Defendant additionally argues that Dr. Halikias gave false testimony, violating defendant's Fourteenth Amendment right to due process. In responding to defendant's expert witness's statement that there is a "divide in the field about research on children's disclosure of sexual abuse," Dr. Halikias said that is "not true" and that the "field is remarkably unified now compared to twenty-five years ago, or twenty years ago, in terms of understanding how children disclose." On appeal, defendant submits numerous studies that he contends contradict this testimony. Defendant did not object to the admission of this testimony in the trial court, and does not actually argue on appeal that it is inadmissible—he just argues that it was false. The credibility of a witness, including an expert witness, is a matter for the factfinder to decide. State v. Sullivan, 2018 VT 112, ¶¶ 17-18, __ Vt. __, 200 A.3d 670. Even if we understood defendant to implicitly argue that the testimony was inadmissible, in the absence of an objection, we would review the trial court's admission of the evidence for plain error. V.R.Cr.P. 52(b). We find no plain error here. Defendant was free to cross examine the State's expert with the studies he presents on appeal, to present contrary expert testimony, and to argue to the jury that the State's expert's assertions were false. Where reasonable minds can differ in interpreting the evidence, we will not substitute our own assessment of the state of research concerning children's disclosure of sexual abuse for the jury's.

complainant's "tone was remarkably declaratory, remarkably specific" was simply a description of the complainant's demeanor, "not tantamount to vouching for [the complainant's] credibility." Oscarson, 2004 VT 4, ¶¶ 65-66.  Likewise here, Dr. Hagan was not vouching for A.B.'s credibility when he testified that her description of her sexual abuse was "significant," "clear," and "graphic." Rather, he was describing his reasons for refraining from questioning A.B. about her history when she had just given a clear and graphic history to another.

     Affirmed.

FOR THE COURT:

_____

Associate Justice

40